IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-21209

_____


ROBERT SMITH

                                    Petitioner - Appellee -
                                    Cross-Appellant

        v.

JANIE COCKRELL, DIRECTOR, TEXAS
DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION

                                    Respondent - Appellant -
                                    Cross-Appellee

_____

        Appeals from the United States District Court
            for the Southern District of Texas
_____
                    November 4, 2002

Before KING, Chief Judge, and HIGGINBOTHAM and BENAVIDES, Circuit
Judges.

KING, Chief Judge:

    Respondent-Appellant-Cross-Appellee Janie Cockrell appeals

the decision by the District Court for the Southern District of

Texas to grant habeas corpus relief to Petitioner-Appellee-Cross-

Appellant Robert Smith.  Upon careful review of the decisions of

the district court and state habeas court, as well as the record,

the briefs of the parties, and the applicable law, we are of the

opinion that the district court erred in granting Smith's motion for habeas corpus relief on the grounds of ineffective assistance of counsel and an unconstitutional jury instruction. We therefore reverse the district court's judgment holding that Smith is entitled to habeas relief. Treating Smith's cross-appeal of the district court's denial of four additional grounds for habeas relief as an application for a certificate of appealability (COA) on those issues, we deny a COA on all grounds. Finally, for the first time in this appeal, Smith raises a claim based on the Supreme Court's recent decision in Atkins v. Virginia, 122 S. Ct. 2242 (2002). We decline to consider it.

I.      **Factual Background**

In the evening of May 15, 1990, Smith and his accomplice[1] entered a Houston clothing store about fifteen minutes before closing. The two men wandered through the store; the clerk on duty, Ms. Kim, became suspicious. She attempted to signal a friend at another store that she was in trouble; she also picked up the phone to call the operator for help. Before she could speak, though, Smith stuck a gun to her head, ordering her to hang up the phone and lay on the ground. At that point Ms. Kim's

---

[1] The accomplice in this case was never identified or charged. Smith allegedly met the man shortly before the robbery and did not know how to locate him afterward; he knew the man only as "Larry."

friend entered the store; Smith's accomplice sprayed the friend with mace.

Smith was unable to open the cash register, so he ordered Kim to stand and retrieve the money from the register. Kim did this; she also surreptitiously moved Smith's car keys from the place where he had set them on the sales counter. Smith and his accomplice fled the store with the money but without his keys. After the two men left, Kim called the police and informed local security guards of the robbery.

Smith and his accomplice ran in the direction of their car, parked at a nearby K-Mart. As they approached the car, they crossed paths with Mr. Griffith, the K-Mart security supervisor; Smith told Griffith to call for an ambulance because the clothing store was on fire. Griffith saw no fire and did not call an ambulance; however, as Griffith was getting into his car, he heard Smith say "I can't find the fucking keys. I can't find the fucking keys." At that point, Smith and his accomplice left the car and fled.

Soon after, another security guard informed Griffith of the robbery. Griffith and the guard got into his car and pursued the two robbers. Griffith saw the two men jump a fence into an abandoned trailer park; he drove the car to an entrance where the gate had been knocked down. About fifteen seconds elapsed between the time Smith and his accomplice jumped the fence and

the time that Griffith and the security guard arrived at the entrance to the trailer park.

As he was exiting the car, Griffith heard a gunshot from within the trailer park; he and the guard took cover in a nearby copse of trees. They heard voices from inside the park. Then, a truck engine started, headlights came on, and the truck headed in Griffith's direction. Griffith fired four warning shots into the air, causing the robbers to stop the truck and flee on foot.

At that point, the police arrived. Griffith and the security guard returned to the K-Mart parking lot to keep an eye on the suspects' car. The police entered the park with a K-9 unit; the dog tracked Smith into a wooded area. The dog located Smith hiding in some underbrush; the police arrested him.

As another officer approached the abandoned truck, he noticed a partially collapsed tent nearby. A deceased male, later identified as James Wilcox, lay on top of the tent. He had been shot in the arm; the bullet passed through his arm into his chest cavity, where it passed through his lungs and severed several major arteries. Smith confessed to robbing the clothing store and to shooting Wilcox; he claimed that, as he told Wilcox that the police were after him and asked for a ride in his truck, Wilcox grabbed his hand and leg. Smith shot Wilcox in the arm in order to get Wilcox to let go of him.

Two days later, on May 17, George Parnham, a board-certified criminal defense lawyer, was appointed to represent Smith in the

4

case.  At that same time, Carlos Correa, another attorney with whom Parnham was not previously acquainted, was appointed co-counsel.

II.      **Procedural History**

On August 30, 1990, Robert Smith[2] was indicted for capital murder for the shooting of James Wilcox during the course of flight from an armed robbery.  Parnham several times attempted to convince Smith to accept a plea bargain; Smith refused, stating that he wanted his day in court before a jury.  At the January, 1992 trial, a jury convicted Smith of capital murder.  At a separate punishment hearing, the jury returned findings to the special issues that mandated the imposition of a death sentence.

The Court of Criminal Appeals upheld Smith's conviction and sentence on direct appeal.  Smith v. State, 898 S.W.2d 838 (Tex. Crim. App. 1995).  The United States Supreme Court denied Smith's petition for certiorari.  Smith v. Texas, 516 U.S. 843 (1995).

On April 24, 1997, Smith filed an application for writ of habeas corpus with a Texas state court pursuant to article 11.071 of the Texas Code of Criminal Procedure.  In addition to considering the merits of the arguments put forth in the application, the state habeas court also held a short evidentiary

---

[2]    Robert Smith is the alias the petitioner was using at the time he was arrested and convicted in this case.  Other records list his name as Robert Lee Johnson; in the state habeas evidentiary proceedings, he was referred to as Robert Lee McBride (which is apparently his true given name).

hearing regarding Smith's claim that he received ineffective assistance of counsel during the punishment phase of his trial. The state habeas court, on March 11, 1998, issued its findings of fact and conclusions of law; the court recommended that the Court of Criminal Appeals deny all of Smith's alleged grounds for relief. The Court of Criminal Appeals held that the state habeas court's findings of fact and conclusions of law had support in the record; the court denied relief. Ex parte Smith, No. 40,871-01 (Tex. Crim. App. Apr. 21, 1999) (unpublished op.).

Smith filed a skeletal petition for habeas corpus with the District Court for the Southern District of Texas on November 10, 1999 and filed a supplemental petition on July 14, 2000. The State moved for summary judgment; while Smith responded to that motion, he did not also request summary judgment. Though Smith requested an evidentiary hearing to aid the district court in reaching its decision, the district court declined to hold one.

On October 31, 2001, the district court granted Smith's request for habeas relief on two grounds: (1) ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984); and (2) the jury's inability, given the special issues in the punishment phase, to consider Smith's mitigating evidence as required by Penry v. Lynaugh, 492 U.S. 302 (1989). The district court granted the State's motion for summary judgment on all of Smith's remaining issues raised in his petition and denied Smith a COA on those issues. The court

6

ordered Smith released unless the state of Texas granted him a new sentencing hearing within 180 days.[3]  The State filed a notice of appeal on November 29, 2001; Smith cross-appealed on December 31, 2001.

III.    **Applicable Law**

As the petitioner filed his original habeas petition on November 10, 1999, the Antiterrorism and Effective Death Penalty Act ("AEDPA") governs review of this case.  See Lindh v. Murphy, 521 U.S. 320, 326-27 (1997) (stating that the AEDPA applies to all cases pending as of April 24, 1996).  Under the AEDPA, a writ of habeas corpus will not be granted with respect to any claim previously adjudicated on the merits in state court unless the adjudication of the claim:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2) (2000).

For pure questions of law and mixed questions of law and fact adjudicated on the merits in state court, the standard articulated in § 2254(d)(1) applies: the state court decision must have been either "contrary to" or "an unreasonable

---

[3]   That order has been stayed pending the outcome of this appeal.

application of" clearly established precedent.  Martin v. Cain, 246 F.3d 471, 475 (5th Cir.), cert. denied, 122 S. Ct. 194 (2001) (mem. op.).  For a state decision to have been "contrary to" established precedent, the state court must have either "arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a decision opposite to" the one reached by the Court.  Williams v. Taylor, 529 U.S. 362, 405 (2000).  A state court decision is an "unreasonable application of" clearly established precedent "if the state court identifie[d] the correct governing legal principle from [the Supreme] Court's decision but unreasonably applie[d] that principle to the facts of the prisoner's case."  Id. at 413.

For purely factual issues, the AEDPA precludes federal habeas relief unless the state court's decision on the merits was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2) (2000).  In addition, the state court's factual determinations carry a presumption of correctness; to rebut them, the petitioner must present clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1) (2000).

Finally, although Smith did not move for summary judgment in this case, the district court's decision essentially granted summary judgment in his favor on the Strickland and Penry issues.

8

While, "[a]s a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases," Clark v. Johnson, 202 F.3d 760, 764 (5th Cir.), cert. denied, 531 U.S. 831 (2000), the rule applies only to the extent that it does not conflict with the habeas rules. Therefore, § 2254(e)(1) – which mandates that findings of fact made by a state court are "presumed to be correct" – overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the nonmoving party. Unless Smith can "rebut[] the presumption of correctness by clear and convincing evidence" as to the state court's findings of fact, they must be accepted as correct.

IV.      **Petitioner's Claim of Ineffective Assistance of Counsel**

A.    *The Strickland Standard*

To prevail on a claim for ineffective assistance of counsel, petitioner must satisfy the two-part test set forth in Strickland v. Washington, 466 U.S. 668 (1984). First, the petitioner must show that counsel's performance was objectively unreasonable. Id. at 688. This requires a showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. However, there is a strong presumption that counsel was competent. See id. at 689:

9

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

Id. For example, counsel's "conscious and informed decision on trial tactics and strategy" is not a permissible basis for a claim of ineffective assistance of counsel unless the strategy was so poor that it robbed the defendant of any opportunity to get a fair trial. Green v. Johnson, 116 F.3d 1115, 1122 (5th Cir. 1997) (citation omitted). So long as counsel made an "adequate investigation," any strategic decisions made as a result of that investigation "fall within the wide range of objectively reasonable professional assistance." Moore v. Johnson, 194 F.3d 586, 591-92 (5th Cir. 1999).

Second, a mere showing that counsel was deficient is not sufficient to merit habeas relief for ineffective assistance of counsel; the petitioner must also demonstrate that, but for counsel's ineffective performance, there is a reasonable probability that a different outcome would have been reached. Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

B.   *Facts and Evidence Relating to Counsel's Performance*

10

Smith's ineffective assistance of counsel claim arises from the punishment phase of his trial. Smith claims that his attorneys were deficient in failing to investigate and present mitigating evidence relating to mental retardation and to organic or neurological brain injury resulting from a childhood automobile accident.

A defense counsel's failure to engage in an appropriate investigation of potential mitigating evidence in the punishment phase can support a claim of ineffective assistance of counsel. Williams, 529 U.S. at 390 (noting that such a claim is governed by the Strickland test). However, a failure to investigate, develop, or present mitigating evidence is not ineffective assistance per se. Moore, 194 F.3d at 615. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691. Furthermore, this court has stated that we "must be particularly wary of 'arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing.'" Dowthitt v. Johnson, 230 F.3d 733, 743 (5th Cir. 2000), cert. denied, 532 U.S. 915 (2001)

11

(quoting <u>Kitchens v. Johnson</u>, 190 F.3d 698, 703 (5th Cir. 1999)).

The state habeas court, after reviewing the arguments and conducting a short evidentiary hearing to take testimony from Mr. Parnham, Smith's lead counsel, made the following findings of fact:

27. The Court finds, based on the statement of facts from trial, that defense counsel asked psychiatrist Fred Fason, M.D., to evaluate the applicant because of the applicant's low I.Q. scores; that defense counsel furnished Fason with the applicant's school records, a description of the instant offense, and a videotape; and, that defense counsel requested that Fason determine whether the applicant's borderline mental retardation rendered the applicant incompetent to stand trial and whether the applicant was sane at the time of the instant offense.

28. At the request of defense counsel, psychiatrist Fason observed some of the punishment proceedings, including the applicant's testimony, and defense counsel questioned Fason regarding his observations of the punishment proceedings.

29. The Court finds, based on a review of the trial and habeas proceedings, that the applicant fails to demonstrate that examination of the applicant by a mental health expert other than psychiatrist Fred Fason, M.D., would have resulted in findings other than those testified to by Fason in the instant trial.

30. The Court finds, based on a review of the statement of facts at trial and habeas proceedings, that defense counsel Parnham investigated the facts of the instant offense; that Parnham investigated and developed facts material to the punishment phase of trial such as the applicant's background, personal history, and social, medical, and mental history; and that Parnham investigated, developed, and presented mitigating evidence at trial.

12

State Habeas Court's Findings of Fact ¶¶ 27-30. Based on these facts, the state habeas court concluded that Parnham had provided effective assistance:

> 5. The applicant fails to demonstrate deficient performance of defense counsel, much less harm in the following areas: alleged failure to investigate, develop, and present mitigating evidence and alleged failure to argue effectively at the punishment phase of trial.

> 6. Additionally, because defense counsel investigated, developed, and presented mitigating evidence at punishment regarding the applicant's background, social, medical, and mental history, the applicant's claim of ineffective assistance of counsel is without merit.

> 7. Additionally, because the applicant fails to demonstrate that the examination of the applicant by a mental health expert other than psychiatrist Fred Fason, M.D., would have resulted in findings other than those testified to by Fason at trial, the applicant's claim of ineffective assistant [sic] of counsel alleging that the applicant should have been examined by a "competent" psychological or neurological expert is without merit.

> 8. Additionally, defense counsel's closing argument at punishment constituted reasonable trial strategy.

State Habeas Court's Conclusions of Law ¶¶ 5-8 (citation omitted).

In his application to the district court, Smith presented no new evidence that had not been before the habeas court, and the district court held no evidentiary hearings to supplement the state habeas court's findings. Although the district court appeared to recognize that it was bound by the deferential AEDPA standards in reviewing the state habeas court's decision, the

13

district court granted Smith's request for relief.  The district court found that the state habeas court unreasonably applied the Strickland standard when it concluded that Smith's counsel had not been ineffective during the punishment phase.  The district court stated that the decision not to investigate or present such evidence was not a tactical or strategic choice made by the attorneys.  Instead, the failure to investigate potential evidence of the long-term effects of a head injury and the petitioner's borderline mental status constituted objectively unreasonable performance.  The court went on to find that, but for this failure, there existed a reasonable possibility that the jury would have either been unable to answer the special issues unanimously or would have answered them "no" – in either case making Smith ineligible for the death penalty.[4]

As stated, Smith claims that there was mitigating evidence that his counsel should have discovered in two areas: (1) possible mental deficiency or retardation; and (2) possible long-

---

[4] Texas law requires, for an imposition of the death sentence, that the jurors be unanimous if they answer "yes" to the special issues.  TEX. CRIM. PROC. CODE ANN. § 37.0711 (Vernon 2002) (stating requirements for offenses committed prior to September 1, 1991).  Therefore, in order to prove that, but for counsel's deficient performance, the outcome would have been different, petitioner must demonstrate only that there is a reasonable probability that at least one juror could have answered the special issues differently had the petitioner's counsel performed effectively.

14

term effects of a head injury.[5]  We will examine the evidence presented before the state habeas court on each issue to determine whether that court's decision on this issue was an unreasonable application of federal law.

1.  *Mental Deficiency or Retardation*

At the punishment phase of Smith's trial, counsel called several witnesses to testify as Smith's mental capabilities. Smith's father, Johnny Vern McBride, stated that Smith read at a "low level" and that he had not attended school regularly past about the fourth or fifth grade.  Also, when asked if he knew what Smith's I.Q. was, McBride responded that he understood what I.Q. was but knew only that Smith was "hard to learn for some reason."

The petitioner also testified on his own behalf at the punishment phase proceedings.  He testified that he had gotten as far as the eighth grade but that he did not know what his I.Q.

---

[5]  Smith also notes, not as an independent <u>Strickland</u> claim but as "background" information for this court to consider, that Mr. Parnham at the state habeas proceeding repeatedly testified to the poor performance of co-counsel, Mr. Correa.  At the state habeas court's evidentiary hearing, Mr. Parnham recalled Mr. Correa being little involved in any aspect of the case, going so far as to read the newspaper and work crossword puzzles during meetings, witness interviews, and voir dire.  Mr. Parnham also recalled that Mr. Correa was virtually no help during trial (where he could have been taking notes, proposing questions, etc.).  While Smith, in his brief, argues that Correa was responsible for preparing and presenting the mitigation defense, there is no evidence in the record to support such a claim.  Mr. Parnham never testified that he and Mr. Correa had divided up the work in such a manner.

was.  Smith did recall that a doctor had examined him at approximately age 16 and had diagnosed him as being mildly mentally retarded.

Smith's main mitigation witness during the punishment phase, called to discussed Smith's mental abilities, was Dr. Fred Fason, a psychiatrist who had been in private practice for over twenty years and who was board certified by the American Board of Psychiatry and Neurology.  Dr. Fason stated that Mr. Parnham had initially contacted him to determine whether, in light of Smith's "low I.Q. scores," Smith was competent to stand trial.  He also stated that, for the purposes of examining Smith, he had obtained records – including school records – from Mr. Parnham.  On cross-examination, the following exchange occurred:

Q:   Now, Doctor, I think you spoke of the defendant's I.Q.?

A:   Yes.

Q:   Okay.  Where would you place him when considering to be borderlineish?  For what?

A:   I would definitely say borderline.  Now, my estimate of his I.Q. came from the tests that I read in the record where he at one scored a 64 which would put him below and make him definitely retarded.  At another time it would be 74. . . . Now, that is correct that behavior and those answers [to some basic testing questions] are consistent with the previous psychological tests of a person who is borderline intelligence.  Now, I felt in talking with him, from the way his mental process worked it's true hew [sic] was a slow learner in special education classes but I felt the way he related things to me that he was above the cutoff line for mental retardation where had he been much more retarded then [sic] what he has

16

started moving into the point about whether he's really competent. But I felt he was above the line but he didn't – to be honest with you, he doesn't have a lot left over or a lot extra upstairs.

Dr. Fason, in addition to testifying about mental retardation, also testified concerning topics relevant to the jury's special issues. First, Dr. Fason attempted to demonstrate that Smith would not be a danger to society past approximately the age of forty.[6] Dr. Fason's ultimate diagnosis was that Smith suffered from an "antisocial reaction" rather than mental retardation. Fason described the condition as one where Smith would understand that what he was doing was wrong at the time he was doing it but that he would not care that it was wrong. He stated that people suffering from antisocial reaction lacked the types of "drive control" that other people have; these controls stop a person from simply doing what he wants because they ensure that he understands and appreciates the effects that his actions have on those around him. Dr. Fason estimated that this condition began to manifest itself during Smith's teenage years and resulted in part from the death of his mother. Dr. Fason also indicated that he was very confident that antisocial reaction was the appropriate diagnosis for Robert Smith.

Dr. Fason then discussed the prognosis for patients suffering from antisocial reaction disorder. He opined that,

---

[6] The second special issue read: "Is there a probability that the defendant, Robert Smith, would commit criminal acts of violence that would constitute a continuing threat to society?"

17

while antisocial reaction is fairly common among people in their late teens and early twenties, by the time these people reach age forty they generally no longer suffer from problems controlling their impulses. By the time they enter their thirties, people with antisocial reaction have matured sufficiently to begin better to appreciate the effects their actions have on other people. Dr. Fason emphasized that point repeatedly. See, e.g., Tr. Vol. XLV at 24 ("And past age 40 you rarely ever see someone with this diagnosis past the age of 40."); Tr. Vol. XLV at 26 ("They get into their late twenties or early thirties or sometimes mid-thirties and they start realizing they do care and telling themselves they don't care doesn't work any more."); Tr. Vol. XLV at 27 ("What happens to them when they get to their forties? Occasionally you will see one but it is relatively rare or at least uncommon in comparison to the number of individuals that fall into this diagnostic category in their twenties.").

Dr. Fason also testified as to whether Smith was able to deliberate on his actions.[7] In doing so, he said that he considered Smith's I.Q. in making his determination. Dr. Fason said that Smith did not deliberate before doing things and that he "never ponders or weighs or balances things." Perhaps most importantly for our purposes, Dr. Fason testified that Smith's

---

[7] The first special issue stated: "Was the conduct of the defendant, Robert Smith, that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased or another would result?"

18

inability to deliberate or to appreciate the effects of his actions was <u>not</u> a product of "just his I.Q. It's a product of someone with an I.Q. of 64, 74 or whatever it is. It's the product of a personality disorder and this is the product of a voice inside you . . . ."

Mr. Parnham made Smith's inability to deliberate the centerpiece of his closing argument. As Dr. Fason had done, Mr. Parnham did not argue that Smith's low I.Q. had contributed to his commission of this crime, saying that he was "sure Robert thought he held his own. Sixty four I.Q., 74; he stuck by his guns and maintained a certain machoism, same thing underscores his statement to [an officer who had discovered Smith smuggling marijuana into his trial], you guys can't do anything, can't stop me."

During the punishment phase of the trial, the State for the first time uncovered additional records that contained evidence of Smith's school performance and results of some mental and I.Q. testing. The records document several years when Smith had been a student within the juvenile detention system; apparently, these tests remained undiscovered until this late in the proceedings because they listed Smith's name as "Robert Lee Johnson" rather than Robert Smith (his current alias) or Robert McBride (his given name). Even though this evidence became available in the punishment phase, Smith's counsel did not reference it as a part of his case-in-chief on the issue of sentencing.

19

These records provide a more complete picture of Smith's mental development as measured by I.Q. scores and other scales and tests of mental proficiency. In 1980, a report indicated a Verbal I.Q. of 67, a Performance I.Q. of 64, and a Full Scale I.Q. of 63. An evaluation form from the Harris County Department of Education from 1982 reported a Verbal I.Q. of 57, a Performance I.Q. of 55, and a Full Scale I.Q. of 52. This report also characterized Smith as falling within the "[m]entally deficient range of intellectual development." In 1983, the Texas Youth Counsel Child Care System placed Smith's Verbal I.Q. at 60, his Performance I.Q. at 72, and his Full Scale I.Q. at 64, noting that these results put him within the "mild mental retardation" range. School records from this time, while not containing I.Q. values, demonstrate grades ranging from B to F in every subject and report achievement test scores that consistently place Smith in the 3rd-5th grade range of academic ability.

At the evidentiary hearing conducted in conjunction with the state habeas proceedings, Mr. Parnham recalled that he hired neither a private investigator nor a "mitigation specialist" (an attorney who helps develop mitigation evidence in capital cases by investigating the defendant's history and background) to assist him in building his case. Mr. Parnham also testified about his trial strategy and how the I.Q. and mental deficiency evidence played into it:

20

> What I was trying to convey to the jury in punishment was that – a number of things, obviously: the nature of the offense itself – although that wasn't necessarily an issue spoken to by Dr. Fason – but whether or not life in the penitentiary would be appropriate punishment for Robert – given the circumstances, given his background, given Dr. Fason's evaluation of Robert.

When asked whether, once he discovered potential evidence of mental retardation in Smith's school records, he considered arguing mental deficiency as a source of mitigation in the punishment phase, Mr. Parnham replied:

> I'm not sure. I thought that – I would assume that I would have made that information available to Dr. Fason. I hope that I did. I am not a – by far not an expert in mental diseases and/or defects. . . . But I would think that, based on what I had done in the past and to include present type of practice, that any information that I would have or questions that I would have in that regard would have been submitted to Dr. Fason and we would have discussed it.

On cross-examination, Mr. Parnham recalled that his impression of Smith generally was that he was "slow." While noting that he surely told this impression to Dr. Fason, he also said that, "had Dr. Fason recommended [additional tests], I would have – certainly followed up on that. That is not to say that I was precluded from following up on those issues because Fason did not recommend that I follow up." As for Smith's I.Q., Mr. Parnham explained why he chose to make lack of intent and inability to deliberate the touchstones of Smith's mitigation defense:[8]

---

[8] To bolster the case for lack of intent, Mr. Parnham had also hired as an expert a forensic pathologist, Dr. Mary

21

Q: Do you recall that those school records indicated that at one point – or maybe at two different instances Mr. McBride had indicated a low I.Q.?

A: I don't remember.

Q: What was your trial strategy at guilt innocence in this case?

A: Bottom is his lack of intent to kill. In my conversations with Mr. Smith and reviewing the State's file and factual preparation, it was apparent to me that that was not only the best legal approach to the representation at guilt or innocence of Mr. Smith but also was borne out factually by the circumstances developed during the police investigation. And I still believe that to this day. It may not be relevant, but I absolutely believe that Robert Smith never intended to kill that man.

Q: Can you tell the Court, please, what your strategy was at – with regards to your punishment argument in this case?

A: If my memory serves me adequately, I would have attempted to portray Robert, based upon the guilt or innocence evidence, as someone not deserving appropriate answers to the questions. And I believed that I needed to carry through the thread of defense that we had developed in guilt or innocence through the punishment phase. I felt very strongly that those facts spoke very positively as far as the lack of intent on this man's part and would justify the jury not answering the questions that would result in the penalty of death.

2. *Petitioner's Childhood Head Injury*

---

Jumbelic, who testified that, in her opinion, Smith did not shoot Wilcox with the intent to kill him. She based her conclusion on the fact that Wilcox was shot in the arm, which a layperson would not expect to result in death because the arm contains "no vital organs."

22

Smith also argues that trial counsel failed to investigate and develop the evidence that Smith had suffered a concussion as a result of an automobile accident when he was a child. At the punishment phase, Smith's father recalled that "[a] truck backed over him, backed into him and hit him beside the head. He wasn't ran over but backed and knocked him unconscious." Mr. Parnham then introduced into evidence the hospital records from Smith's head injury.

The medical records discuss the circumstances of the accident, noting that, according to an eyewitness, Smith remained unconscious for 10-15 minutes. Smith complained of a headache throughout the evening and into the next morning, when he was taken to a clinic for skull x-rays and other studies. Smith was diagnosed with a "slight brain concussion" and treated with aspirin for the pain. He attended six or seven followup visits over the next three weeks; at no time did his condition appear to worsen, though he still had intermittent headaches. At his final visit, the physician noted no neurological abnormalities, a normal X-ray, and a normal electroencephalogram (EEG). Smith was told to continue to take aspirin for his headaches. There is no evidence that any further treatment was ever sought or needed following the accident.

Mr. Parnham questioned Smith's father extensively concerning Smith's headaches during the weeks following the accident. On cross-examination, the State elicited the following testimony:

23

Q: You're not telling this jury here, sir, that the childhood accident that Robert had – we all have had some childhood accidents. You're not telling this jury that that caused your son to go out and commit these offense [sic] the jury has found him guilty of?

A: No, sir.

At the state habeas evidentiary hearing, Mr. Parnham attempted to recall how he dealt with this evidence of Smith's childhood head injury:

Q: Do you recall [Smith's father] brought you a letter from a medical clinic regarding a head injury?

A: I would – I can't dispute that.

Q: Do you recall what, if anything, you did with that information?

A: I do not. I would assume that I would have turned it over to Dr. Fason, but I don't recall that.

He also testified that he was aware that head injuries could produce delayed reactions. While Mr. Parnham was unable to recall much of what happened concerning the medical records (given that the evidentiary hearing occurred nearly seven years after Smith's sentencing hearing), he did say that "I cannot believe that I would not have talked to Dr. Fason" about the medical records. Mr. Parnham did admit that he never personally consulted with any kind of head injury specialist.

In his state habeas petition, Smith also argued that the scant amount of medical evidence should have been buttressed by scholarly studies indicating that childhood accidents can have delayed effects that result in "permanent brain injury." Smith

24

presented a spate of articles that demonstrated the potential long-term effects of acute brain injuries. Much of the research seeks to draw a correlation between brain injury and later inability to control violent behavior or to employ "normal" problem-solving strategies. While some of the studies Smith cites had not yet been published at the time of his sentencing hearing, other articles were available and arguably could have been relied upon to show that a person who suffered a head injury could develop long-term sequelae as a result.

C. *Analysis of Trial Counsel's Performance*

The district court found that the state habeas court's conclusion that Mr. Parnham was not ineffective counsel was an unreasonable application of the <u>Strickland</u> standard. We find that the district court erred in this determination. The state court's determination that Smith did not receive ineffective assistance of counsel was not contrary to, or an unreasonable application of, clearly established federal law.

This court has previously refused to find ineffective assistance of counsel where "trial counsel performed appropriately, recognizing the <u>possible</u> issues regarding . . . [the defendant's] mental capacity, recognizing the need for expert assistance in exploring these issues, and employing a defense expert." <u>Dowthitt</u>, 230 F.3d at 748 (internal citation and quotation omitted) (emphasis and alteration in original).

25

Mr. Parnham testified repeatedly that he gave whatever information he had concerning Smith's background – including school and medical records – to his expert, Dr. Fason. Dr. Fason testified that he had been appointed by the court to evaluate "between 1000 and 1500" defendants and that he had testified before a jury "probably 50 times" during his long tenure as a psychiatrist. Mr. Parnham, who admitted that he was "not an expert in mental diseases and/or defects," relied extensively upon Dr. Fason's advice as to the best way to handle Smith's case. For example, Mr. Parnham testified that, had Dr. Fason recommended additional testing for Smith in the areas of mental retardation or possible neurologic damage from the head injury, Mr. Parnham would have seen to it that the tests were done (remarking that the judge "did not close the purse . . . on finances that would have been needed for Robert's defense").

Dr. Fason, based on the evidence, concluded that the most appropriate diagnosis was "antisocial reaction." Dr. Fason's observations of the defendant placed Smith "above the cutoff line for mental retardation." Smith now asks that we find Mr. Parnham's assistance to have been ineffective because Mr. Parnham relied upon Dr. Fason's findings and opinion instead of pushing ahead with his own investigation or hiring new experts who may have reached a different diagnosis. However, this court has refused to find that counsel violated the Strickland standard by failing to locate a different expert after the original expert

26

concluded that the defendant was not mentally retarded.  Williams v. Cain, 125 F.3d 269, 278 (5th Cir. 1997).

Dr. Fason had in his possession at least one set of records that demonstrated Smith's I.Q. to be in the 60-70 range – certainly close enough to the line dividing mental retardation from borderline normal intelligence to alert someone with Dr. Fason's experience to the potential that Smith was mentally retarded.  Dr. Fason evaluated this data within the scope of all of the evidence, including his own impressions of Smith and his prior experience in handling similar cases.  Mr. Parnham testified that he relied on Dr. Fason as to what steps should be taken in building this part of the mitigation defense; Dr. Fason, in reaching the antisocial reaction diagnosis, must have determined that further investigation into the question of whether Smith was mentally retarded was unnecessary.  He thought – and Mr. Parnham agreed – that the antisocial reaction diagnosis constituted solid mitigation on both the deliberateness and future dangerousness special issues.

Smith presents no evidence that Dr. Fason would have changed his opinion had he been presented with additional test results that were largely similar to those he had already used in making his evaluation.  Indeed, given Dr. Fason's extensive experience in this area, it is not unreasonable to conclude that he expected that other I.Q. or other performance evaluations would be substantially similar to the ones he had already seen.  If the

27

records he already had led him to conclude that Smith was not mentally retarded, there is no evidence that additional similar records would have convinced him to change his mind.

The same analysis applies to the question of whether Mr. Parnham sufficiently investigated the head injury. He turned over Smith's medical records from the time of the accident to his expert witness. Dr. Fason, after evaluating the records in the context of his impression of Smith, determined that the head injury had likely had no long-term effects that could form the basis for a mitigation defense. Mr. Parnham relied upon this conclusion in determining whether to order additional neurological examinations or imaging tests to further evaluate the extent of Smith's lingering injuries. While the scholarly studies which Smith argues would have bolstered his case were available, Mr. Parnham should not be faulted for failing to expend the time and money necessary to find them where Dr. Fason did not believe that they were relevant to Smith's defense.

Counsel should be permitted to rely upon the objectively reasonable evaluations and opinions of expert witnesses without worrying that a reviewing court will substitute its own judgment, with the inevitable hindsight that a bad outcome creates, and rule that his performance was substandard for doing so. Mr. Parnham's actions in this case were objectively reasonable. The state habeas court did not unreasonably apply federal law in denying Smith's request for relief on this ground. We reverse

28

the district court's holding to the contrary; there is no Strickland violation.[9]

## V. Petitioner's Claim that the Jury Could Not Give Weight to His Mitigating Evidence Under the Special Issues in the Punishment Phase

At trial, Smith's counsel attempted to persuade the court to include an additional special issue targeted at giving the jury an outlet to consider Smith's mitigating evidence specifically. The trial court refused, choosing to go with a close variant on what was at the time the standard jury instruction in a capital case. The jury was given the following special issues and "nullification" instruction:

1. Was the conduct of the defendant, Robert Smith, that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

2. Is there a probability that the defendant, Robert Smith, would commit criminal acts of violence that would constitute a continuing threat to society?

3. Was the conduct of the defendant, Robert Smith, in killing the deceased unreasonable in response to the provocation, if any, by the deceased?

You are instructed that when you deliberate on the questions posed in the special issues, you are to consider all relevant mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the Defendant's character, background,

---

[9] Because we find that counsel's performance was not objectively unreasonable, we do not need to reach the second prong of the Strickland analysis.

29

record, emotional instability, intelligence or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and thereafter, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, a negative finding should be given to that special issue under consideration.

On direct appeal, the Court of Criminal Appeals considered and rejected Smith's claim that the punishment phase jury instructions did not give the jury the opportunity to consider his mitigating evidence. <u>Smith</u>, 898 S.W.2d at 853-4. Because it held that the nullification instruction was appropriate, it did not reach the question of whether Smith had "proffered sufficient evidence to raise a <u>Penry</u> issue." <u>Id.</u> at 854 n.27.

On this issue, the state habeas court issued the following findings of fact:

10. On direct appeal, the Court of Criminal Appeals overruled the applicant's points of error that the trial court erred in overruling the applicant's proposed instruction concerning mitigating evidence, in overruling his objecting to the instruction given, and in refusing to include his fourth special issue, holding that the Court had previously approved of the nullification instruction submitted in the instant case and that the Court had held that a trial court does not err in submitting a nullification instruction rather than a special issue.

11. In a footnote in the direct appeal opinion, the Court of Criminal Appeals stated that because the applicant received a proper nullification

30

instruction, the Court need not reach the issue of whether the applicant proffered sufficient evidence to raise a Penry issue sufficient to warrant an instruction.

State Habeas Court's Findings of Fact ¶¶ 10-11 (citation omitted).  Based on these findings, the habeas court concluded:

3.  Because the applicant's second ground for relief, that his death sentence violates his constitutional rights because the jury could not give effect to the applicant's alleged mitigating evidence, was previously raised and rejected on direct appeal, there is no need to reconsider the issue.

4.  Additionally, the jury could give effect to the applicant's alleged mitigating evidence.

State Habeas Court's Conclusions of Law ¶¶ 3-4 (citation omitted).

The district court, finding that the state court had considered the claim on the merits, reviewed that finding under the AEDPA standard.[10]  28 U.S.C. § 2254(d) (2000).  A recently

---

[10]  The state habeas court's conclusion of law stating that "[a]dditionally, the jury could give effect to the applicant's alleged mitigating evidence" qualifies as a decision on the merits sufficient to warrant deferential AEDPA review.  The Court of Criminal Appeals based its ruling on direct appeal on its conclusion that the nullification instruction was permissible, whether or not Smith had presented Penry-type evidence; in fact, that court explicitly declined to reach the Penry evidence question.  Because Penry II invalidated the nullification instruction in cases where the defendant presents Penry evidence, the Court of Criminal Appeals' findings on direct appeal on this issue are now incorrect.  However, it appears that the state habeas court, in considering Smith's state habeas petition (which fully presented the Penry evidence question) and in reaching its alternate conclusion in ¶ 4, actually considered the Penry question and determined that Smith's evidence of mental retardation did not qualify for a Penry instruction.  The Court of Criminal Appeals adopted that finding.

31

decided Supreme Court case, Penry v. Johnson, 532 U.S. 782 (2001) [Penry II], had held that the nullification instruction which the trial court had given did not permit the jury to give effect to a defendant's constitutionally relevant mitigating evidence; therefore, the district court considered whether Smith had presented such evidence to the jury. After examining each of the types of mitigating evidence Smith presented, the court held that Smith's evidence of mental retardation rose to the level of Penry I evidence.[11] As a result, the district court concluded that the state habeas court's finding that the jury could give effect to all of Smith's mitigating evidence was an unreasonable application of clearly established federal law.

Smith presented four broad categories of mitigating evidence in the sentencing phase: (1) evidence of a childhood head injury; (2) evidence of the circumstances of the murder; (3) evidence of his antisocial reaction disorder; and (4) evidence of his low I.Q. and possible mental retardation. The district court in this case found that only the fourth category qualified as Penry evidence. Smith has not appealed[12] the district court's

_____

[11] The district court rejected Smith's claim that his evidence of the circumstances of the murder and the evidence of his antisocial reaction disorder also qualified as Penry I evidence.

[12] In his notice of appeal, Smith listed as a ground for appeal the district court's finding that his evidence of antisocial reaction was not Penry evidence. However, Smith did not brief that issue. Issues not briefed, even if raised on appeal, are considered waived or abandoned. United States v.

32

conclusions as to the first three categories; therefore, this court will review only the district court's conclusion that the state habeas court unreasonably applied federal law in refusing to grant Smith's request for relief on this issue.[13]

A.    *Penry I*

It is well-settled that a "capital-sentencing system must allow the sentencing authority to consider mitigating circumstances."  Jurek v. Texas, 428 U.S. 262, 271 (1976).  Jurek directly examined the Texas capital sentencing scheme, holding that, even though the special issues did not directly address mitigation, the jury could satisfactorily use those special issues to consider whatever mitigating evidence the defendant presented.  Id. at 272.  The Supreme Court, in a later case, expressly recognized that the "future dangerousness" special issue created a sufficient opportunity for the jury to consider mitigating evidence.  Lockett v. Ohio, 438 U.S. 586, 606-07 (1978).

However, in Penry v. Lynaugh, 492 U.S. 302 (1989) [Penry I], the Supreme Court ruled that, in certain cases, the Texas special

_____

Reyes, 300 F.3d 555, 558 n.2 (5th Cir. 2002).

[13]   While Smith presents, in his Strickland claim, copious evidence that he argues his trial counsel should have discovered after appropriate investigation, that evidence is irrelevant for purposes of the Penry analysis.  See Boyd v. Johnson, 167 F.3d 907, 912 (5th Cir. 1999) ("A petitioner cannot base a Penry claim on evidence that could have been but was not proffered at trial.").

issues did not permit the jury to give effect to the defendant's mitigating evidence. We have interpreted <u>Penry I</u> to say that:

> [W]hen a capital defendant introduces evidence about his background, character, or circumstances that reflects a reduced personal culpability, <u>and</u> the jury cannot give effect to the mitigating force of that evidence in response to Texas' special issues, the trial court must, upon request, provide instructions that allow the jury to consider and give mitigating effect to that evidence.

<u>Davis v. Scott</u>, 51 F.3d 457, 460 (5th Cir. 1995), <u>cert. denied</u>, 516 U.S. 992 (1995) (emphasis in original). In such a situation, the jury instructions must include a statement that the jury "could consider and give effect to the mitigating evidence" by refusing to impose the death penalty as a means of expressing its "reasoned moral response" to that evidence. <u>Penry I</u>, 492 U.S. at 328. Failure to include such an instruction violates the Eighth and Fourteenth Amendments. <u>Id.</u>

<u>Penry I</u> created two separate issues that must be considered when determining whether the defendant's jury instruction was constitutionally deficient. First, we must consider whether the mitigating evidence presented during the trial was relevant beyond the scope of the special issue questions. Only after the petitioner has demonstrated that he presented such evidence will we examine the supplemental mitigation instruction to determine whether this additional instruction provided a sufficient vehicle for the jury to weigh and give effect to the mitigating evidence.

B. *Constitutionally Relevant Mitigating Evidence*

34

In attempting to refine and apply the Court's holding in

Penry I, this court has adopted a two-part test for determining

whether a defendant's mitigating evidence rises to the level of

Penry evidence necessitating a special instruction.  We "must

determine (1) that the proffered evidence was constitutionally

relevant mitigating evidence, and, if so, (2) that the proffered

evidence was beyond the 'effective reach' of the jurors."  Madden

v. Collins, 18 F.3d 304, 308 (5th Cir. 1994), cert. denied, 513

U.S. 1156 (1995) (emphasis in original) (quoting Johnson v.

Texas, 509 U.S. 350, 366 (1993)).  In determining whether a

defendant's mitigating evidence is constitutionally relevant, the

question is whether "the evidence implicate[s] the basic concern

of Penry 'that defendants who commit criminal acts that are

attributable to a disadvantaged background, or to emotional and

mental problems, may be less culpable than defendants who have no

such excuse.'" Madden, 18 F.3d at 307 (quoting Penry I, 492 U.S.

at 319).

However, merely presenting evidence that a defendant was

disadvantaged or has emotional or mental problems is not enough,

per se, to raise a Penry problem.  "[T]he evidence must show (1)

a 'uniquely severe permanent handicap[] with which the defendant

was burdened through no fault of his own,' and (2) that the

criminal act was attributable to this severe permanent

condition."  Davis, 51 F.3d at 460-61 (quoting Graham v. Collins,

35

950 F.2d 1009, 1029 (5th Cir. 1992) (en banc))[14]. On the issue

of whether the defendant has a "uniquely severe permanent

handicap", this court has limited Penry I to the facts of that

case; in other words, in all of the cases we have considered, we

have found a Penry I problem to exist only where the petitioner

presents mitigating evidence relating either to severe mental

retardation or to extreme child abuse.[15]

The second part of this test for proving constitutionally

relevant mitigating evidence essentially states a "nexus"

requirement. To warrant relief, the defendant must demonstrate

---

[14] These are requirements set by Penry, as this court has read Penry. We express no opinion on the impact, if any, of Atkins v. Virginia, 122 S. Ct. 2242 (2002), on these requirements.

[15] In a footnote, the district court presented an extensive list of claims that we have rejected under the Penry analysis. These include: schizophrenia, Hernandez v. Johnson, 248 F.3d 344 (5th Cir. 2001); evidence that the petitioner was not the triggerman, Green v. Johnson, 160 F.3d 1029, 1044 (5th Cir. 1998); youth and intoxication, Tucker v. Johnson, 115 F.3d 276, 281-82 (5th Cir. 1997); evidence of good behavior during pretrial detention, Turner v. Johnson, 106 F.3d 1178, 1189 (5th Cir. 1997); good character, Nicols v. Scott, 69 F.3d 1255, 1267-68 (5th Cir. 1995); remorse, Briddle v. Scott, 63 F.3d 364, 377 (5th Cir. 1995); provocation, Vuong v. Scott, 62 F.3d 673, 682 (5th Cir. 1995); violent sexual proclivities, Davis, 51 F.3d at 460-65; victim resistance and panic, Kinnamon v. Scott, 33 F.3d 462, 466-67 (5th Cir. 1994); "troubled childhood", Jacobs v. Scott, 31 F.3d 1319, 1326-28 (5th Cir. 1994); low intelligence, Lackey v. Scott, 28 F.3d 486, 489 (5th Cir. 1994); personality disorders, Madden, 18 F.3d at 1234-37; drug use, Callins v. Collins, 998 F.2d 269, 274-76 (5th Cir. 1993); religious devotion, Jernigan v. Collins, 980 F.2d 292, 295 (5th Cir. 1992); military service, Black v. Collins, 962 F.2d 394, 404-05 (5th Cir. 1992); and acceptance of responsibility, Wilkerson v. Collins, 950 F.2d 1054, 1060-62 (5th Cir. 1992).

that there is a nexus between the criminal act and the mitigating evidence presented to explain it. Turner v. Johnson, 106 F.3d 1178, 1189 (5th Cir. 1997). This requirement echoes the language of Penry I, where the Supreme Court found that Penry's mitigating evidence demonstrated that his criminal acts were "attributable to" his disadvantaged background and mental problems. Penry I, 492 U.S. at 304. The nexus needs not be a perfectly direct connection; so long as the evidence can "permit a rational jury to 'infer that the crime is attributable,' at least in part, to the defendant's background," the nexus requirement is met. Russell v. Collins, 998 F.2d 1287, 1292 (5th Cir. 1993) (citing Graham, 950 F.2d at 1033).

C.   *Penry II*

The Supreme Court recently revisited the Texas approach to mitigating evidence. In Penry II, the Court considered a jury instruction very similar to the one in this case and determined that it did not satisfy the requirements of Penry I. Penry II, 532 U.S. at 804. "Although the supplemental instruction made mention of mitigating evidence, the mechanism it purported to create for the jurors to give effect to that evidence was ineffective and illogical." Id. A juror who decided that the mitigating evidence was sufficient to spare the defendant's life had no effective vehicle for expressing that conclusion. Id.

37

Smith's did receive essentially the same nullification instruction that Penry did.  However, that instruction alone, in the absence of Penry I evidence, does not raise a Penry II problem.  As a result, Penry II will not even be considered as grounds for habeas relief until Smith has demonstrated that he presented Penry-type mitigating evidence.  Therefore, we must first examine his mitigating evidence against the Penry I standard as this court has interpreted it.

D.   *Smith's Mitigating Evidence*

The evidence presented at the sentencing hearing concerning Smith's possible mental retardation was extensively discussed earlier in the analysis of Smith's Strickland claim, and thus it will not be laid out again here.  Based on that evidence, the state habeas court, in rejecting Smith's Penry claim, reached a conclusion that was not contrary to, or an unreasonable application of, clearly established federal law.  The district court erred in granting Smith's request for relief on this issue.

A review of the facts of Penry demonstrates the vast difference between the evidence of mental retardation presented in that case and the evidence Smith proffered to the jury.  At the initial competency hearing, Penry's expert psychiatrist testified that Penry had likely suffered from organic brain damage since birth.  That expert, Dr. Brown, placed Penry's I.Q. between 50 and 63, in the range of mild to moderate retardation.

38

Then, during the guilt-innocence portion of the trial, Penry called a different psychiatrist, Dr. Garcia. Dr. Garcia testified that Penry's organic brain damage and "moderate" mental retardation "made it impossible for him to appreciate the wrongfulness of his conduct or to conform his conduct to the law." Penry I, 492 U.S. at 307-09. Penry's mother also testified that Penry had been "unable to learn in school" and hadn't finished the first grade; his sister recalled seeing Penry frequently beaten over the head with a belt and confined to his room for long periods of time. Id. at 309.

The state called two psychiatric experts of its own. One of its experts, Dr. Peeples, testified that, on two previous occasions, he personally had diagnosed Penry as being mentally retarded. While the state experts disagreed with the defense over the extent of Penry's mental illness, both state experts acknowledged that Penry seemed incapable of learning from his past mistakes and that his mental abilities were "extremely limited." Id. at 309-10.

Smith's expert, Dr. Fason, did not testify that Smith was mentally retarded, let alone that his mental retardation made him unable to appreciate what he had done or learn from his mistakes. To the contrary, Dr. Fason specifically testified that he believed Smith was not mentally retarded:

> I felt in talking with him, from the way his mental
> process worked it's true hew [sic] was a slow learner in
> special education classes but I felt the way he related

39

things to me <u>that he was above the cutoff line for mental retardation</u> . . . . But I felt he was above the line but he didn't – to be honest with you, he doesn't have a lot left over or a lot extra upstairs.

Furthermore, Dr. Fason believed that the murder was "attributable to" Smith's antisocial reaction disorder because it prevented him from understanding the effect that his actions had on others; the crux of Smith's mitigation defense was that the disease would likely abate by the time he entered his late thirties or early forties, thereby no longer making him a danger to society. When Dr. Fason addressed Smith's borderline I.Q. scores, he did so in the context of attempting to demonstrate that Smith was unable to act with the deliberateness required by the first special issue.

In short, the evidence on mental retardation presented during the punishment phase tended to show three things: (1) Smith had a low I.Q.; (2) Smith had borderline mental abilities; and (3) Dr. Fason did not believe that Smith's mental problems (aside from his antisocial reaction disorder) caused him to commit this crime. This evidence comes far from demonstrating that Smith suffered from a "uniquely severe permanent handicap" and that the criminal act was "attributable" to this condition. <u>Davis</u>, 51 F.3d at 460.[16] This court has repeatedly held that

---

[16]  Smith argues that we cannot find both no <u>Strickland</u> problem and no <u>Penry</u> problem; if the evidence of mental retardation presented at trial was insufficient to warrant a <u>Penry</u> instruction, it is only because Mr. Parnham violated the <u>Strickland</u> standard by failing to investigate and develop it. While facially intriguing, the argument is ultimately unpersuasive. Mr. Parnham had no reason to develop the mental

40

neither evidence of low I.Q. nor evidence of borderline retardation is sufficient to warrant a <u>Penry</u> instruction. <u>See</u>, <u>e.g.</u>, <u>Jones v. Johnson</u>, 171 F.3d 270, 275-76 (5th Cir. 1999) (low I.Q.); <u>Boyd v. Johnson</u>, 167 F.3d 907, 909-11 (5th Cir. 1999) (low I.Q.); <u>Harris v. Johnson</u>, 81 F.3d 535, 539-40 (5th Cir. 1996) (borderline retardation); <u>Andrews v. Collins</u>, 21 F.3d 612, 624 (5th Cir. 1994) (borderline retardation).  Evidence of low I.Q. may be properly considered by the jury in the context of either of the first two special issues.  <u>See</u>, <u>e.g.</u>, <u>Lackey v. Johnson</u>, 28 F.3d 486, 489-90 (5th Cir. 1994) (evidence of low I.Q. goes to question of future dangerousness); <u>Cuevas v. Collins</u>, 932 F.2d 1078, 1083 (5th Cir. 1991) (evidence of low I.Q. goes to question of defendant's ability to deliberate).

The state habeas court concluded that, because Smith failed to present constitutionally relevant mitigating evidence at trial, the trial court's nullification instruction permitted the jury to consider fully all of Smith's mitigating evidence.  The district court erred in finding this to be an unreasonable application of clearly established federal law.  We reverse that court's grant of habeas relief on this issue.

---

retardation evidence because Dr. Fason had determined that Smith was likely not mentally retarded.  The evidence presented at trial did not meet the <u>Penry</u> standard because Mr. Parnham, after consultation with Dr. Fason, chose an alternative trial strategy that, unfortunately for Smith, both was unsuccessful and failed to qualify as constitutionally relevant mitigating evidence under the <u>Penry</u> standard.

## VI. Petitioner's Claims Denied by the District Court

Smith cross-appeals on four issues from the district court's decision to deny habeas relief and to deny a COA. We will treat Smith's cross-appeal as an application for a COA on these issues. We may grant Smith's application only if Smith "has made a substantial showing of a constitutional right." 28 U.S.C. § 2253(c)(2) (2000). To make this showing, Smith must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Dowthitt, 230 F.3d at 740 (quoting Slack v. McDaniel, 529 U.S. 473, 483-84 (2000). Where the petitioner's claim has been denied on procedural grounds at the district court level, to obtain a COA he must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack, 529 U.S. at 484.

Three of these issues can be considered together: Smith argues that the trial court violated his Sixth, Eighth, and Fourteenth Amendment rights by failing to instruct the jury specifically that any one juror had the power to prevent the jury from returning "yes" answers to the special verdicts. Smith also

argues that the trial court violated his Eighth Amendment rights by refusing to instruct the jury on the minimum amount of time that Smith would be incarcerated if the jury opted not to impose the death sentence.

A.    *The "10-12" Rule*

Under Texas law, in order for a sentence of death to be imposed, all twelve jurors must return an answer of "yes" to each of the special issues.  The jury may not return an answer of "no" on any of the special issues unless at least ten jurors vote to do so.  This is commonly known as the "10-12 Rule."  <u>Alexander v. Johnson</u>, 211 F.3d 895, 897 (5th Cir. 2000).  Smith argues that the jury should have been specifically and explicitly advised that, should any single juror refuse to return an answer of "yes" on any of the special issues, Smith would not be sentenced to death.

The state habeas court dismissed this claim because Smith failed to object to the instructions at trial.  Texas law mandates that the "failure to object to a jury instruction precludes appellate review of a claimed defect in the charge."  <u>Fierro v. Lynaugh</u>, 879 F.2d 1276, 1281 (5th Cir. 1989).  This court has consistently held that this rule requiring contemporaneous objections constitutes an adequate and independent state ground sufficient to create a procedural bar for federal habeas review of the petitioner's claim.  <u>Fisher v.</u>

<u>State</u>, 169 F.3d 295, 300 (5th Cir. 1999). However, because the state habeas court also made statements concerning the merits of this claim, the district court concluded that it was unclear whether the state court relied on the Texas contemporaneous objection rule as an adequate and independent state ground for denying relief. Therefore, the district court considered and rejected Smith's claim on the merits.

The Supreme Court, though, has previously held that state courts may both rely on state procedural grounds and reach federal substantive questions in denying habeas relief without violating the principle that their decision must rest on adequate and independent state grounds. <u>Harris v. Reed</u>, 489 U.S. 255, 263 (1989). So long as the "last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar," we can conclude that the state court rested its decision independently on the state procedural grounds. <u>Id.</u> (quoting <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 327 (1985)).

We conclude that the state habeas court's decision that Smith's claim was procedurally barred by the contemporaneous objection rule "clearly and expressly" rests on adequate and independent state procedural grounds. There is no need for us to reach the merits of his claim. As Smith has failed to make a substantial showing of the denial of a constitutional right, we decline his request for a COA on this issue.

44

2.    *Minimum Time of Incarceration*

Smith also argues that the trial court violated his Eighth Amendment rights by refusing to instruct the jury as to the minimum amount of time that he would remain incarcerated should the jury decide not to impose a death sentence.  More specifically, Smith argues that "evolving standards of decency" should guide this court to change existing precedent.

The state argues that Smith's claim is unexhausted and procedurally barred because he failed to allege an "evolving standards of decency" claim in his state court appeals and because he failed to provide any factual basis for such a claim when he raised it in his federal petition.  We agree.  "Normally, the exhaustion requirement is not satisfied if a petitioner presents new legal theories or entirely new factual claims in his petition to the federal court."  Vela v. Estelle, 708 F.2d 954, 958 (5th Cir. 1983), cert. denied, 464 U.S. 1053 (1984).  This claim is unexhausted and thus procedurally barred.

However, even where a claim is unexhausted and procedurally barred, we may deny the claim on the merits.  28 U.S.C. § 2254(b)(2) (2000).  The district court examined Smith's arguments and determined that, on the merits, he was not entitled to habeas relief.  We review the district court's conclusions of law de novo.  Nobles v. Johnson, 127 F.3d 409, 423 (5th Cir. 1997).  The district court's reasoning is sound, and Smith presents no new

45

evidence or case law on this appeal to call that decision into question.  Smith has not demonstrated that this finding would be debatable among jurists of reason, nor has he made a substantial showing of the denial of a constitutional right.  Therefore, we decline Smith's request for a COA.

VII.     **Petitioner's Claim for Relief Based on the Supreme Court Decision in <u>Atkins v. Virginia</u>**

Smith raises one final claim for the first time on this appeal.  In <u>Atkins v. Virginia</u>, 122 S. Ct. 2242 (2002), the Supreme Court held that executions of mentally retarded criminals violated the Eighth Amendment prohibition against cruel and unusual punishment.  Smith argues that, because the jury reached a general verdict on the special issue concerning future dangerousness, "it is impossible to know from that verdict whether one or more jurors found that Petitioner had an I.Q. under 75 and had additional functional disabilities, such that the Petitioner qualified as being retarded for Eighth Amendment purposes, but nevertheless found him to pose a future danger."

Both sides concede that Smith is raising this claim for the first time.  We have consistently refused to address issues in the habeas context raised for the first time on appeal.  <u>See</u>, <u>e.g.</u>, <u>Johnson v. Puckett</u>, 176 F.3d 809, 814 (5th Cir. 1999) ("[A] contention not raised by a habeas petitioner in the district court cannot be considered for the first time on appeal from that court's denial of habeas relief.") (citation omitted).

46

Furthermore, unlike Smith's Eighth Amendment claim discussed earlier, there is no clear precedent upon which we could rely in simply deciding the case on the merits. The <u>Atkins</u> Court stated that it would "leave to the States the task" of developing standards to determine and define who is ineligible for capital punishment on the basis of mental retardation. <u>Atkins</u>, 122 S.Ct. at 2250. As the Texas courts have not yet had that opportunity, we decline to usurp their position as the ultimate arbiter of state law. We decline to consider Smith's unexhausted claim for habeas relief based upon <u>Atkins</u>.

VIII.          **Conclusion**

For the reasons stated above, we REVERSE the district court insofar as it granted habeas relief to the petitioner on his claims that he received ineffective assistance of counsel during the sentencing phase and that he was entitled to a <u>Penry</u> mitigation instruction. In addition, we decline to grant Smith's request for a COA on petitioner's other issues. Finally, we decline to consider Smith's <u>Atkins</u> claim.

47