## TENNARD *v.* DRETKE, DIRECTOR, TEXAS DEPART-MENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

No. 02–10038.   Argued March 22, 2004—Decided June 24, 2004

*Robert C. Owen* argued the cause for petitioner. With him on the briefs were *Jordan M. Steiker* and *Richard H. Burr.*

*Edward L. Marshall,* Assistant Attorney General of Texas, argued the cause for respondent. With him on the brief were *Greg Abbott,* Attorney General, *Barry R. McBee,* First Assistant Attorney General, *Don Clemmer,* Acting Deputy Attorney General, and *Gena Bunn* and *Tommy L. Skaggs,* Assistant Attorneys General.*

JUSTICE O'CONNOR delivered the opinion of the Court.

In *Penry* v. *Lynaugh,* 492 U. S. 302 (1989) *(Penry I),* we held that the Texas capital sentencing scheme provided a constitutionally inadequate vehicle for jurors to consider and give effect to the mitigating evidence of mental retardation and childhood abuse the petitioner had presented. The petitioner in this case argues that the same scheme was inadequate for jurors to give effect to his evidence of low intelligence. The Texas courts rejected his claim, and a Federal District Court denied his petition for a writ of habeas corpus. We conclude that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack* v. *McDaniel,* 529 U. S. 473, 484 (2000), and therefore hold that a certificate of appealability should have issued.

I

Petitioner Robert Tennard was convicted by a jury of capital murder in October 1986. The evidence presented at trial indicated that Tennard and two accomplices killed two of his neighbors and robbed their house. Tennard himself stabbed one of the victims to death, and one of the accomplices killed the other victim with a hatchet.

---

*Briefs of *amici curiae* urging reversal were filed for the American Association on Mental Retardation et al. by *James W. Ellis, Michael B. Browde, Christian G. Fritz, April Land,* and *Robert L. Schwartz;* for the National Mental Health Association by *J. Brett Busby, Claudia Wilson Frost,* and *Charles S. Kelley;* and for the Texas Defender Service et al. by *Peter Buscemi, Anthony C. Roth,* and *Jeffrey J. Pokorak.*

During the penalty phase of the trial, defense counsel called only one witness—Tennard's parole officer—who testified that Tennard's Department of Corrections record from a prior incarceration indicated that he had an IQ of 67. App. 28–29. He testified that the IQ test would have been administered as a matter of course. *Ibid.* The report, which indicated that Tennard was 17 years old at the time it was prepared, was admitted into evidence. On cross-examination, the parole officer testified that he did not know who had administered the test. *Id.,* at 30. The government introduced evidence in the penalty phase regarding a prior conviction for rape, committed when Tennard was 16. The rape victim testified that she had escaped through a window after Tennard permitted her to go to the bathroom to take a bath, promising him she would not run away. *Id.,* at 16–17.

The jury was instructed to consider the appropriate punishment by answering the two "special issues" used at the time in Texas to establish whether a sentence of life imprisonment or death would be imposed:

> "Was the conduct of the defendant, Robert James Tennard, that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased or another would result?" *Id.,* at 69 (the "deliberateness special issue").
> "Is there a probability that the defendant, Robert James Tennard, would commit criminal acts of violence that would constitute a continuing threat to society?" *Id.,* at 70 (the "future dangerousness special issue").

In his penalty phase closing argument, defense counsel relied on both the IQ score and the rape victim's testimony to suggest that Tennard's limited mental faculties and gullible nature mitigated his culpability:

> "Tennard has got a 67 IQ. The same guy that told this poor unfortunate woman [the rape victim] that was trying to work that day, 'Well, if I let you in there, will you

leave?' And he believed her. This guy with the 67 IQ, and she goes in and, sure enough, she escapes, just like she should have. That is uncontroverted testimony before you, that we have got a man before us that has got an intelligence quotient . . . that is that low." *Id.*, at 51.

In rebuttal, the prosecution suggested that the low IQ evidence was simply irrelevant to the question of mitigation:

"But whether he has a low IQ or not is not really the issue. Because the legislature, in asking you to address that question [the future dangerousness special issue], the reasons why he became a danger are not really relevant. The fact that he is a danger, that the evidence shows he's a danger, is the criteria to use in answering that question." *Id.*, at 60.

The jury answered both special issues in the affirmative, and Tennard was accordingly sentenced to death.

Unsuccessful on direct appeal, Tennard sought state post-conviction relief. He argued that, in light of the instructions given to the jury, his death sentence had been obtained in violation of the Eighth Amendment as interpreted by this Court in *Penry I.* In that case, we had held that "it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence." *Penry I, supra,* at 319; see also *Penry* v. *Johnson,* 532 U. S. 782, 797 (2001) *(Penry II)* (describing "'give effect to'" language of *Penry I* as "the key" to that decision). We concluded that the same two special issues that were presented to Tennard's jury (plus a third immaterial to the questions now before us) were insufficient for the jury in Penry's case to consider and give effect to Penry's evidence of mental retardation and childhood abuse, and therefore ran afoul of the Eighth Amendment. *Penry I,* 492 U. S., at 319–328. His mental retardation evidence, we held, "'had relevance to [his] moral culpability beyond the scope of the [deliberate-

ness] special verdict questio[n]'" because "[p]ersonal culpability is not solely a function of a defendant's capacity to act 'deliberately.'" *Id.*, at 322 (some brackets in original). Moreover, because the "evidence concerning Penry's mental retardation indicated that one effect of his retardation is his inability to learn from his mistakes," his retardation was relevant to the future dangerousness special issue "only as an *aggravating* factor." *Id.*, at 323. As to the evidence of childhood abuse, we held that the two special issues simply failed to "provide a vehicle for the jury to give [it] mitigating effect." *Id.*, at 322–324.

The Texas Court of Criminal Appeals rejected Tennard's *Penry* claim. *Ex parte Tennard*, 960 S. W. 2d 57 (1997) (en banc). Writing for a plurality of four, Presiding Judge McCormick observed that the definition of mental retardation adopted in Texas involves three components ("(1) subaverage general intellectual functioning, (2) concurrent deficits in adaptive behavior, *and* (3) onset during the early development period," *id.*, at 60), and concluded: "[Tennard's] evidence of a low IQ score, standing alone, does not meet this definition. Qualitatively and quantitatively [Tennard's] low IQ evidence does not approach the level of Johnny Paul Penry's evidence of mental retardation. . . . [W]e find no evidence in this record that applicant is mentally retarded." *Id.*, at 61.

The plurality went on to consider whether Tennard would be entitled to relief under *Penry* even if his low IQ fell "within *Penry*'s definition of mental retardation." 960 S. W. 2d, at 61. It held that he would not. The court explained that, unlike the evidence presented in Penry's case, "there is no evidence [that Tennard's] low IQ rendered him unable to appreciate the wrongfulness of his conduct when he committed the offense, or that his low IQ rendered him unable to learn from his mistakes or . . . control his impulses . . . ." *Id.*, at 62. It found there was "no danger" that the jury would have given the evidence "*only* aggravating effect in

answering" the future dangerousness special issue, and that the low IQ and gullibility evidence was not beyond the jury's effective reach because the jury "could have used this evidence for a 'no' answer" to the deliberateness special issue. *Ibid.*

Two judges concurred separately, and wrote that "this Court has sustained a *Penry* claim *only* when there is evidence of mental retardation. But even in those cases, the evidence of mental retardation was always something more than what was presented in this case." 960 S. W. 2d, at 64 (opinion of Meyers, J.) (citations omitted). Taking a more permissive view of evidence of impaired intellectual functioning than did the plurality ("[F]or *Penry* purposes, courts should not distinguish between mental retardation and dementia," even though the onset of the latter "may occur after age eighteen," *id.*, at 65), the concurring judges nevertheless concluded that "the record does not contain sufficient evidence to support" Tennard's *Penry* claim. 960 S. W. 2d, at 63. The concurring judges also rejected Tennard's contention that "evidence of an IQ of below 70 alone requires a '*Penry* instruction'" because published opinions of the Texas courts had uniformly required more. *Id.*, at 67.

Judge Baird dissented, maintaining that the Court of Criminal Appeals had "consistent[ly]" held, in the wake of *Penry I*, that "evidence of mental retardation cannot be adequately considered within the statutory" special issues. 960 S. W. 2d, at 67. The court had strayed from its precedent, Judge Baird wrote, and instead of asking simply whether the jury had a vehicle for considering the mitigating evidence, had "weigh[ed] the sufficiency of [Tennard's] mitigating evidence." *Id.*, at 70. Judges Overstreet and Womack dissented without opinion. *Id.*, at 63.

Tennard sought federal habeas corpus relief. The District Court denied his petition. *Tennard* v. *Johnson*, Civ. Action No. H–98–4238 (SD Tex., July 25, 2000), App. 121. The court began by observing that "[e]vidence of a single low

score on an unidentified intelligence test is not evidence that Tennard was mentally retarded." *Id.*, at 128. It then considered whether the 67 IQ score was "within 'the effective reach' of the jury." *Ibid.* Noting that "Tennard's low IQ score was not concealed from the jury; it was in evidence, and both sides argued its significance for punishment," the court concluded that the jury had adequate means, in the two special issues, by which to give effect to that mitigating evidence. *Id.*, at 129. The court subsequently denied Tennard a certificate of appealability (COA). Civ. Action No. H–98–4238 (SD Tex., Oct. 17, 2000), see App. 2.

The Court of Appeals for the Fifth Circuit, after full briefing and oral argument, issued an opinion holding that Tennard was not entitled to a COA because his *Penry* claim was not debatable among jurists of reason. *Tennard* v. *Cockrell*, 284 F. 3d 591 (2002). The court began by stating the test applied in the Fifth Circuit to *Penry* claims, which involves a threshold inquiry into whether the petitioner presented "constitutionally relevant" mitigating evidence, that is, evidence of a " 'uniquely severe permanent handicap with which the defendant was burdened through no fault of his own,' " and evidence that " 'the criminal act was attributable to this severe permanent condition.' " 284 F. 3d, at 595.

The court then held that Tennard was not entitled to a COA, for two reasons: First, it held that evidence of low IQ alone does not constitute a uniquely severe condition, and rejected Tennard's claim that his evidence was of mental retardation, not just low IQ, because no evidence had been introduced tying his IQ score to retardation. *Id.*, at 596. Second, it held that even if Tennard's evidence was mental retardation evidence, his claim must fail because he did not show that the crime he committed was attributable to his low IQ. *Id.*, at 596–597. Judge Dennis dissented, concluding that the Texas court's application of *Penry* was unreasonable and that Tennard was entitled to habeas relief. 284 F. 3d, at 597–604.

Tennard filed a petition for certiorari, and this Court granted the writ, vacated the judgment, and remanded for further consideration in light of *Atkins* v. *Virginia,* 536 U. S. 304 (2002). *Tennard* v. *Cockrell,* 537 U. S. 802 (2002). The Fifth Circuit took the remand to be for consideration of a substantive *Atkins* claim. It observed that "Tennard has never argued that the Eighth Amendment prohibits his execution" and reinstated its prior panel opinion. *Tennard* v. *Cockrell,* 317 F. 3d 476, 477 (2003). We again granted certiorari. 540 U. S. 945 (2003).

## II

## A

A COA should issue if the applicant has "made a substantial showing of the denial of a constitutional right," 28 U. S. C. § 2253(c)(2), which we have interpreted to require that the "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack* v. *McDaniel,* 529 U. S., at 484; see also *Miller-El* v. *Cockrell,* 537 U. S. 322, 336 (2003) ("Under the controlling standard, a petitioner must 'sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further"'"). The petitioner's arguments ultimately must be assessed under the deferential standard required by 28 U. S. C. § 2254(d)(1): Relief may not be granted unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

The State has never disputed that Tennard's *Penry* claim was properly preserved for federal habeas review. Not only did the state court consider the question on the merits, we note that the issue was also raised by defense counsel prior

to trial in a motion to set aside the indictment on the ground, among others, that the "Texas capital murder statutes do not explicitly allow the consideration of any specific mitigating circumstances at the punishment phase of the prosecution and, consequently, are violative of the accused's right to be free from cruel and unusual punishment and are also void for vagueness." Defendant's Motion to Set Aside the Indictment in Cause No. 431127 (248th Jud. Dist. Ct. Harris County, Tex., May 28, 1986), p. 4.

## B

Despite paying lipservice to the principles guiding issuance of a COA, *Tennard* v. *Cockrell,* 284 F. 3d, at 594, the Fifth Circuit's analysis proceeded along a distinctly different track. Rather than examining the District Court's analysis of the Texas court decision, it invoked its own restrictive gloss on *Penry I:*

> "In reviewing a *Penry* claim, we must determine whether the mitigating evidence introduced at trial was constitutionally relevant and beyond the effective reach of the jury. . . . To be constitutionally relevant, 'the evidence must show (1) a uniquely severe permanent handicap with which the defendant was burdened through no fault of his own, . . . and (2) that the criminal act was attributable to this severe permanent condition.'" *Id.,* at 595 (quoting *Davis* v. *Scott,* 51 F. 3d 457, 460–461 (CA5 1995)).

This test for "constitutional relevance," characterized by the State at oral argument as a threshold "screening test," Tr. of Oral Arg. 10, 28, appears to be applied uniformly in the Fifth Circuit to *Penry* claims. See, *e. g., Bigby* v. *Cockrell,* 340 F. 3d 259, 273 (2003); *Robertson* v. *Cockrell,* 325 F. 3d 243, 251 (2003) (en banc); *Smith* v. *Cockrell,* 311 F. 3d 661, 680 (2002); *Blue* v. *Cockrell,* 298 F. 3d 318, 320–321 (2002); *Davis, supra,* at 460–461. Only after the court finds that

certain mitigating evidence is "constitutionally relevant" will it consider whether that evidence was within " 'the "effective reach" of the jur[y].' " *E. g., Smith, supra,* at 680 (court asks whether evidence was constitutionally relevant and, " 'if so,' " will consider whether it was within jury's effective reach). In *Tennard* v. *Cockrell,* the Fifth Circuit concluded that Tennard was "precluded from establishing a *Penry* claim" because his low IQ evidence bore no nexus to the crime, and so did not move on to the "effective reach" question. 284 F. 3d, at 597.

The Fifth Circuit's test has no foundation in the decisions of this Court. Neither *Penry I* nor its progeny screened mitigating evidence for "constitutional relevance" before considering whether the jury instructions comported with the Eighth Amendment. Indeed, the mitigating evidence presented in *Penry I* was *concededly* relevant, see Tr. of Oral Arg., O. T. 1988, No. 87–6177, pp. 34–36, so even if limiting principles regarding relevance were suggested in our opinion—and we do not think they were—they could not have been material to the holding.

When we addressed directly the relevance standard applicable to mitigating evidence in capital cases in *McKoy* v. *North Carolina,* 494 U. S. 433, 440–441 (1990), we spoke in the most expansive terms. We established that the "meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding" than in any other context, and thus the general evidentiary standard—" " "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" ' "—applies. *Id.,* at 440 (quoting *New Jersey* v. *T. L. O.,* 469 U. S. 325, 345 (1985)). We quoted approvingly from a dissenting opinion in the state court: " 'Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.' " 494 U. S., at

440 (quoting *State* v. *McKoy,* 323 N. C. 1, 55–56, 372 S. E. 2d
12, 45 (1988) (opinion of Exum, C. J.)). Thus, a State cannot
bar "the consideration of . . . evidence if the sentencer could
reasonably find that it warrants a sentence less than death."
494 U. S., at 441.

Once this low threshold for relevance is met, the "Eighth
Amendment requires that the jury be able to consider and
give effect to" a capital defendant's mitigating evidence.
*Boyde* v. *California,* 494 U. S. 370, 377–378 (1990) (citing
*Lockett* v. *Ohio,* 438 U. S. 586 (1978); *Eddings* v. *Oklahoma,*
455 U. S. 104 (1982); *Penry I,* 492 U. S. 302 (1989)); see also
*Payne* v. *Tennessee,* 501 U. S. 808, 822 (1991) ("We have held
that a State cannot preclude the sentencer from considering
'any relevant mitigating evidence' that the defendant prof-
fers in support of a sentence less than death. . . . [V]irtually
no limits are placed on the relevant mitigating evidence a
capital defendant may introduce concerning his own circum-
stances" (quoting *Eddings, supra,* at 114)).

The Fifth Circuit's test is inconsistent with these princi-
ples. Most obviously, the test will screen out any positive
aspect of a defendant's character, because good character
traits are neither "handicap[s]" nor typically traits to which
criminal activity is "attributable." In *Skipper* v. *South Car-
olina,* 476 U. S. 1, 5 (1986), however, we made clear that
good character evidence can be evidence that, "[u]nder
*Eddings,* . . . may not be excluded from the sentencer's con-
sideration." We observed that even though the petitioner's
evidence of good conduct in jail did "not relate specifically to
petitioner's culpability for the crime he committed, there is
no question but that such [evidence] would be 'mitigating' in
the sense that [it] might serve 'as a basis for a sentence less
than death.' *Lockett, supra,* at 604." *Id.;* at 4–5 (citation
omitted). Such evidence, we said, of "a defendant's disposi-
tion to make a well-behaved and peaceful adjustment to life
in prison is . . . by its nature relevant to the sentencing deter-
mination." *Id.,* at 7. Of course, the Texas courts might

reasonably conclude that evidence of good conduct in jail was within the jury's effective reach via the future dangerousness special issue. See *Franklin* v. *Lynaugh*, 487 U. S. 164, 177–178 (1988) (plurality opinion); *id.*, at 185–186 (O'CONNOR, J., concurring in judgment). But under the Fifth Circuit's test, the evidence would have been screened out before the time came to consider that question.

In Tennard's case, the Fifth Circuit invoked both the "uniquely severe" and the "nexus" elements of its test to deny him relief under *Penry I. Tennard* v. *Cockrell*, 284 F. 3d, at 596 (contrasting Tennard's low IQ evidence, which did "not constitute a uniquely severe condition," with mental retardation, a "severe permanent condition"); *id.*, at 596–597 (concluding that *Penry* claims "must fail because [Tennard] made no showing at trial that the criminal act was attributable" to his condition).* Neither ground provided an adequate reason to fail to reach the heart of Tennard's *Penry* claims.

We have never denied that gravity has a place in the relevance analysis, insofar as evidence of a trivial feature of the defendant's character or the circumstances of the crime is unlikely to have any tendency to mitigate the defendant's culpability. See *Skipper, supra,* at 7, n. 2 ("We do not hold that all facets of the defendant's ability to adjust to prison life must be treated as relevant and potentially mitigating. For example, we have no quarrel with the statement . . . that 'how often [the defendant] will take a shower' is irrelevant to the sentencing determination" (quoting *State* v. *Plath,* 281

---

*The Fifth Circuit stated that "a majority of the Court of Criminal Appeals found 'no evidence in this record that [Tennard] is mentally retarded.'" 284 F. 3d, at 596–597. As described above, however, that was the conclusion of a four-judge plurality; the narrowest and thus controlling opinion on this point, correctly described by the Fifth Circuit as "conclud[ing] that there was *not enough* evidence of mental retardation in the record to support Tennard's claim," *id.,* at 596, n. 5 (emphasis added), is Judge Meyers' concurring opinion.

S. C. 1, 15, 313 S. E. 2d 619, 627 (1984))). However, to say that only those features and circumstances that a panel of federal appellate judges deems to be "severe" (let alone "uniquely severe") could have such a tendency is incorrect. Rather, the question is simply whether the evidence is of such a character that it "might serve 'as a basis for a sentence less than death,'" *Skipper, supra,* at 5.

The Fifth Circuit was likewise wrong to have refused to consider the debatability of the *Penry* question on the ground that Tennard had not adduced evidence that his crime was attributable to his low IQ. In *Atkins* v. *Virginia,* 536 U. S., at 316, we explained that impaired intellectual functioning is inherently mitigating: "[T]oday our society views mentally retarded offenders as categorically less culpable than the average criminal." Nothing in our opinion suggested that a mentally retarded individual must establish a nexus between her mental capacity and her crime before the Eighth Amendment prohibition on executing her is triggered. Equally, we cannot countenance the suggestion that low IQ evidence is not relevant mitigating evidence—and thus that the *Penry* question need not even be asked—unless the defendant also establishes a nexus to the crime.

The State claims that "the Fifth Circuit's *Penry I* jurisprudence is not at issue" in this case. Brief for Respondent 35, n. 21; Tr. of Oral Arg. 33. To the contrary, that jurisprudence is directly at issue because the Fifth Circuit denied Tennard relief on the ground that he did not satisfy the requirements imposed by its "constitutional relevance" test. As we have explained, the Fifth Circuit's screening test has no basis in our precedents and, indeed, is inconsistent with the standard we have adopted for relevance in the capital sentencing context. We therefore hold that the Fifth Circuit assessed Tennard's *Penry* claim under an improper legal standard. Cf. *Miller-El* v. *Cockrell,* 537 U. S., at 341 (holding, on certiorari review of the denial of a COA, that the

Fifth Circuit had applied an incorrect standard by improperly merging the requirements of two statutory sections).

## C

We turn to the analysis the Fifth Circuit should have conducted: Has Tennard "demonstrate[d] that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong"? *Slack* v. *McDaniel,* 529 U. S., at 484. We conclude that he has.

Reasonable jurists could conclude that the low IQ evidence Tennard presented was relevant mitigating evidence. Evidence of significantly impaired intellectual functioning is obviously evidence that "might serve 'as a basis for a sentence less than death,'" *Skipper,* 476 U. S., at 5; see also, *e. g., Wiggins* v. *Smith,* 539 U. S. 510, 535 (2003) (observing, with respect to individual with IQ of 79, that "Wiggins['] . . . diminished mental capacitie[s] further augment his mitigation case"); *Burger* v. *Kemp,* 483 U. S. 776, 779, 789, n. 7 (1987) (noting that petitioner "had an IQ of 82 and functioned at the level of a 12-year-old child," and later that "[i]n light of petitioner's youth at the time of the offense, . . . testimony that his 'mental and emotional development were at a level several years below his chronological age' could not have been excluded by the state court" (quoting *Eddings,* 455 U. S., at 116)).

Reasonable jurists also could conclude that the Texas Court of Criminal Appeals' application of *Penry* to the facts of Tennard's case was unreasonable. The relationship between the special issues and Tennard's low IQ evidence has the same essential features as the relationship between the special issues and Penry's mental retardation evidence. Impaired intellectual functioning has mitigating dimension beyond the impact it has on the individual's ability to act deliberately. See *Penry I,* 492 U. S., at 322. A reasonable jurist could conclude that the jury might well have given Tennard's low IQ evidence aggravating effect in considering his future

dangerousness, not only as a matter of probable inference from the evidence but also because the prosecutor told them to do so: "[W]hether he has a low IQ or not is not really the issue. Because the legislature, in asking you to address that question, the reasons why he became a danger are not really relevant. The fact that he is a danger, that the evidence shows he's a danger, is the criteria to use in answering that question." App. 60. Indeed, the prosecutor's comments pressed exactly the most problematic interpretation of the special issues, suggesting that Tennard's low IQ was irrelevant in mitigation, but relevant to the question whether he posed a future danger.

* * *

We hold that the Fifth Circuit's "uniquely severe permanent handicap" and "nexus" tests are incorrect, and we reject them. We hold that reasonable jurists would find debatable or wrong the District Court's disposition of Tennard's low-IQ-based *Penry* claim, and that Tennard is therefore entitled to a COA. The judgment of the United States Court of Appeals for the Fifth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, dissenting.

A certificate of appealability may only issue if the applicant has "made a substantial showing of the denial of a constitutional right," 28 U. S. C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack* v. *McDaniel*, 529 U. S. 473, 484 (2000). Because I believe that reasonable ju-

rists would not find the District Court's assessment of the constitutional claims debatable or wrong, I dissent.

The District Court conducted the proper inquiry by examining whether Tennard's evidence of low intelligence was "within 'the effective reach'" of the jury. App. 128 (quoting *Johnson* v. *Texas*, 509 U. S. 350, 368 (1993)). And the District Court came to the correct result; that is, the special issues allowed the jury to give some mitigating effect to Tennard's evidence of low intelligence. *Id.*, at 369; *Graham* v. *Collins*, 506 U. S. 461, 475 (1993).

In *Jurek* v. *Texas*, 428 U. S. 262 (1976), this Court held that the Texas special issues system, as a general matter, is constitutional. The special issues system guides the jury's consideration of mitigating evidence at sentencing. We have stated:

> "Although *Lockett* [v. *Ohio*, 438 U. S. 586 (1978),] and *Eddings* [v. *Oklahoma*, 455 U. S. 104 (1982),] prevent a State from placing relevant mitigating evidence 'beyond the effective reach of the sentencer,' *Graham, supra,* at 475, those cases and others in that decisional line do not bar a State from guiding the sentencer's consideration of mitigating evidence. Indeed, we have held that 'there is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence "in an effort to achieve a more rational and equitable administration of the death penalty."' *Boyde* v. *California*, 494 U. S. 370, 377 (1990) (quoting *Franklin* v. *Lynaugh*, 487 U. S. 164, 181 (1988) (plurality opinion))." *Johnson, supra,* at 362.

In *Penry* v. *Lynaugh*, 492 U. S. 302 (1989) *(Penry I)*, the Court concluded that the Texas special issues were too limited to give effect to Penry's mitigating evidence of his mental retardation and severe childhood abuse. But we have noted that *Penry I* did not "effec[t] a sea change in this

Court's view of the constitutionality of the former Texas death penalty statute," *Graham, supra,* at 474. Tennard's evidence of low intelligence simply does not present the same difficulty that Penry's evidence did.

There is no dispute that Tennard's low intelligence is a relevant mitigating circumstance, and that the sentencing jury must be allowed to consider that mitigating evidence. See, *e. g., Eddings* v. *Oklahoma,* 455 U. S. 104, 110 (1982) (" '[T]he sentencer . . . [may] not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense' " (emphasis deleted) (quoting *Lockett* v. *Ohio,* 438 U. S. 586, 604 (1978))). But the Constitution does not require that "a jury be able to give effect to mitigating evidence in every conceivable manner in which the evidence [may] be relevant." *Johnson, supra,* at 372. The only question in this case is whether reasonable jurists would find the District Court's assessment that Tennard's evidence of low intelligence was within the effective reach of the jury via the Texas special issues debatable or wrong.

The Court concludes that "[t]he relationship between the special issues and Tennard's low IQ evidence has the same essential features as the relationship between the special issues and Penry's mental retardation evidence." *Ante,* at 288. I disagree. The first special issue asked whether Tennard had caused the death of the victim " 'deliberately and with the reasonable expectation that the death of the deceased or another would result.' " *Ante,* at 277. As the Court of Criminal Appeals of Texas noted and the District Court agreed, the mitigating evidence of Tennard's low intelligence could be given effect by the jury through this deliberateness special issue. It does not follow from the Court's conclusion in *Penry I* that mental retardation had relevance to Penry's moral culpability beyond the scope of the deliberateness special issue that evidence of low intelligence has the same relevance. And, after *Johnson* and *Graham,* it is clear

that the question is simply whether the jury could give *some effect* to the mitigating evidence through the special issues. *Johnson, supra,* at 369 (rejecting the petitioner's claim that a special instruction was necessary because his evidence of youth had relevance outside the special issue framework); *Graham, supra,* at 476–477 ("[R]eading *Penry [I]* as petitioner urges—and thereby holding that a defendant is entitled to special instructions whenever he can offer mitigating evidence that has *some* arguable relevance beyond the special issues—would be to require in all cases that a fourth 'special issue' be put to the jury: '"Does any mitigating evidence before you, whether or not relevant to the [other special issues], lead you to believe that the death penalty should not be imposed?"' The *Franklin* [v. *Lynaugh,* 487 U. S. 164 (1988),] plurality rejected precisely this contention, finding it irreconcilable with the Court's holding in *Jurek,* see *Franklin, supra,* at 180, n. 10, and we affirm that conclusion today").

The second special issue asked "'[i]s there a probability that the defendant . . . would commit criminal acts of violence that would constitute a continuing threat to society?'" *Ante,* at 277. Here, too, this case is very different from *Penry I,* where there was expert medical testimony that Penry's condition prevented him from learning from experience. 492 U. S., at 308–309. Here, no such evidence was presented. Given the evidence, the jury could have concluded that low intelligence meant that Tennard is a slow learner, but with the proper instruction, he could conform his behavior to social norms. It also could have concluded, as the Court of Criminal Appeals of Texas noted, that Tennard was a "'follower'" rather than a "'leader,'" App. 91, and that he again could conform his behavior in the proper environment. In either case—contrary to *Penry I*—the evidence could be given mitigating effect in the second special issue. In short, low intelligence is not the same as mental

retardation and does not necessarily create the *Penry I* "two-edged sword." 492 U. S., at 324. The two should not be summarily bracketed together.

Because I do not think that reasonable jurists would disagree with the District Court's conclusion that the jury in this case had the ability to give mitigating effect to Tennard's evidence of low intelligence through the first and second special issues, I dissent.

JUSTICE SCALIA, dissenting.

Petitioner argues that Texas's statutory special issues framework unconstitutionally constrained the jury's discretion to give effect to his mitigating evidence of a low IQ score, violating the requirement that " ' "a sentencer must be allowed to give *full* consideration and *full* effect to mitigating circumstances." ' " Reply Brief for Petitioner 4 (quoting *Penry* v. *Johnson,* 532 U. S. 782, 797 (2001) *(Penry II),* in turn quoting *Johnson* v. *Texas,* 509 U. S. 350, 381 (1993) (O'CONNOR, J., dissenting)). This claim relies on *Penry* v. *Lynaugh,* 492 U. S. 302 (1989) *(Penry I),* a case that applied principles earlier limned in *Eddings* v. *Oklahoma,* 455 U. S. 104 (1982), and *Lockett* v. *Ohio,* 438 U. S. 586 (1978).

I have previously expressed my view that this "right" to unchanneled sentencer discretion has no basis in the Constitution. See *Penry I, supra,* at 356–360 (opinion concurring in part and dissenting in part). I have also said that the Court's decisions establishing this right do not deserve *stare decisis* effect, because requiring unchanneled discretion to say *no* to death cannot rationally be reconciled with our prior decisions requiring canalized discretion to say *yes.* "[T]he practice which in *Furman* [v. *Georgia,* 408 U. S. 238 (1972) *(per curiam),*] had been described as the discretion to sentence to death and pronounced constitutionally prohibited, was in *Woodson* [v. *North Carolina,* 428 U. S. 280 (1976) (plurality opinion),] and *Lockett* renamed the discretion not to

sentence to death and pronounced constitutionally required." *Walton* v. *Arizona*, 497 U. S. 639, 662 (1990) (SCALIA, J., concurring in part and concurring in judgment).

The Court returned greater rationality to our *Penry* jurisprudence by cutting it back in *Graham* v. *Collins*, 506 U. S. 461 (1993), and *Johnson* v. *Texas, supra.* I joined the Court in this pruning effort, noting that "the essence of today's holding (to the effect that discretion *may* constitutionally be channeled) was set forth in my dissent in *Penry.*" *Id.,* at 374 (concurring opinion). As THE CHIEF JUSTICE notes, the lower courts' disposition of petitioner's *Penry* claim in the present case was entirely appropriate under these cases. *Ante,* at 290–293 (dissenting opinion). Yet the opinion for the Court does not even acknowledge their existence. It finds failings in the Fifth Circuit's framework for analyzing *Penry* claims as if this Court's own jurisprudence were not the root of the problem. "The simultaneous pursuit of contradictory objectives necessarily produces confusion." *Walton, supra,* at 667.

Although the present case involves only a certificate of appealability (COA) ruling, rather than a ruling directly on the merits of petitioner's claim, I cannot require the issuance of a COA when the insubstantial right at issue derives from case law in which this Court has long left the Constitution behind and embraced contradiction. I respectfully dissent.

JUSTICE THOMAS, dissenting.

Petitioner must rely on *Penry* v. *Lynaugh,* 492 U. S. 302 (1989), to argue that Texas' special issues framework unconstitutionally limited the discretion of his sentencing jury. I have long maintained, however, that *Penry* did "so much violence to so many of this Court's settled precedents in an area of fundamental constitutional law, [that] it cannot command the force of *stare decisis.*" *Graham* v. *Collins,* 506 U. S. 461, 497 (1993) (concurring opinion). I therefore agree with JUSTICE SCALIA that a certificate of appealability can-

not be issued based upon an "insubstantial right . . . derive[d] from case law in which this Court has long left the Constitution behind and embraced contradiction." *Ante*, at 294 (dissenting opinion). I respectfully dissent.