United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 21, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 03-11248
_____

RONALD CURTIS CHAMBERS,

Petitioner - Appellant,

versus

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS
DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas, Dallas
USDC No. 3:99-CV-1283-L

_____

Before JOLLY, SMITH, and WIENER, Circuit Judges.

PER CURIAM:[*]

At his third trial in 1992, Ronald Curtis Chambers ("Chambers") was convicted of capital murder and sentenced to death, for the third time, for the 1975 murder of Mike McMahan during the course of a robbery. This court granted a certificate of appealability ("COA") authorizing Chambers to appeal the district court's denial of federal habeas relief as to certain claims. We AFFIRM.

_____

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

I

In April 1975, Chambers and an accomplice, Clarence Ray Williams, forced their way, at gunpoint, into the car occupied by two college students, Mike McMahan and Deia Sutton, outside a night club in Dallas, Texas. After robbing the victims, they drove to a levee and forced the victims from the car, and down an embankment. Both victims were shot. As Chambers and Williams walked back up the hill, McMahan called out to Sutton. Williams told Chambers that the victims were not dead and Chambers responded, "They gotta be dead. I shot 'em in the head." Williams and Chambers returned to the location of the victims. Chambers struck McMahan in the head numerous times with the barrel of the shotgun and ordered Williams to take Sutton into the water. Williams pulled Sutton to the water and attempted to choke and drown her. When Chambers finished beating McMahan, he approached Sutton, who begged him not to kill her. He ignored her pleas, raised his shotgun over his head, and struck her three times. McMahan died, but Sutton survived. After committing the crime, Chambers washed blood and hair off the shotgun, wiped blood from the stolen money and divided it, and then played dominoes before going to sleep. A more complete description of this brutal crime can be found in the opinion of the Texas Court of Criminal Appeals. Chambers v. State, 903 S.W.2d 21, 24-25 (Tex. Crim. App. 1995). Williams pleaded guilty and was sentenced to two stacked terms of life imprisonment.

Chambers was convicted and sentenced to death in 1976 for capital murder during the course of a robbery. His conviction was affirmed on direct appeal. Chambers v. State, 568 S.W.2d 313 (Tex. Crim. App. 1978), cert. denied, 440 U.S. 928 (1979). His first state habeas application was denied in 1981. Ex parte Chambers, 612 S.W.2d 572 (Tex. Crim. App. 1981). His conviction was reversed in his second state habeas action in 1984, because the State's psychologist had interviewed him without informing him that his statements would be used to obtain a death sentence. Ex parte Chambers, 688 S.W.2d 483 (Tex. Crim. App. 1984), cert. denied, 474 U.S. 864 (1985).

Chambers was retried, convicted, and sentenced to death in 1985. His second conviction was reversed on direct appeal because of violations under Batson v. Kentucky, 476 U.S. 79 (1986). Chambers v. State, 784 S.W.2d 29 (Tex. Crim. App.), cert. denied, 496 U.S. 912 (1989).

In 1992, Chambers was convicted and sentenced to death for the third time. His conviction and sentence were affirmed on direct appeal. Chambers v. State, 903 S.W.2d 21 (Tex. Crim. App. 1995). His state habeas application, filed in October 1996, was denied by the state trial court in September 1998. Ex parte Chambers, Application No. 7,929-03 (Tex. Crim. App. March 24, 1999) (unpublished). In March 1999, the Texas Court of Criminal Appeals adopted the trial court's findings and conclusions and denied relief.

Chambers filed his federal habeas petition in October 1999, raising 41 claims.  On August 26, 2003, the district court denied relief.  Chambers v. Cockrell, No. 3:99-CV-1283-L (N.D. Tex. Aug. 26, 2003) (unpublished).  The district court denied Chambers's application for a COA in December 2003.

Chambers requested a COA from this court for sixteen claims.  This court granted a COA for the claims discussed below.  Chambers v. Dretke, No. 03-11248 (Aug. 19, 2005) (unpublished).  The parties filed supplemental briefs on the merits of the claims for which a COA was granted, and this court heard oral arguments of counsel.  Having considered the arguments of counsel, and based on our review of the state court record, we conclude that the state court's decision to deny relief on these claims is not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.  We therefore AFFIRM the district court's denial of federal habeas relief.

II

Based on our "threshold inquiry", consisting of "an overview of the claims in the habeas petition and a general assessment of their merits," Miller-El v. Cockrell, 537 U.S. 322, 327, 336 (2003), this court granted a COA authorizing Chambers to appeal the denial of relief as to the following claims:

(1) that Chambers's Sixth Amendment right to counsel was violated when one of two attorneys appointed to represent him on the direct appeal of his third conviction in 1992 had a conflict of

4

interest based on that attorney's representation of Chambers's accomplice, Clarence Ray Williams, in guilty plea proceedings in 1975;

(2) that his appellate counsel rendered ineffective assistance on direct appeal by (a) failing to appeal the denial of Batson objections to the prosecution's peremptory strikes of three minority jurors; (b) failing to appeal the prosecutor's comment on the defense's failure to produce photographs; and (c) failing to appeal the admission of testimony from a news reporter regarding statements made by Chambers while he was on death row;

(3) that his Eighth Amendment rights were violated by the trial court's refusal to permit the introduction of evidence of his accomplice's criminal history to demonstrate Chambers's comparative culpability; and, alternatively, whether appellate counsel rendered ineffective assistance by failing to raise the issue on direct appeal; and

(4) that the Texas capital punishment statute in effect at the time of his trial is unconstitutional as applied to Chambers because it prohibited the jury from considering mitigating evidence, and because it prohibited the court from submitting to the jury a special issue regarding whether mitigating evidence warranted a life sentence.

Chambers is not entitled to habeas relief on these claims unless the state court's adjudication of the claims "(1) resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d). The state court's factual determinations "shall be presumed to be correct", and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). We conclude that Chambers has not made the required showing, for the reasons stated in the following discussion of each of the claims.

A

The state court did not unreasonably conclude that Chambers's Sixth Amendment right to counsel was not violated because Lawrence Mitchell, one of the two attorneys appointed to represent him on the direct appeal of his third conviction in 1992, had a conflict of interest based on Mitchell's representation of his accomplice, Clarence Ray Williams, in guilty plea proceedings in 1975. The state court rejected this claim, holding that Mitchell did not actively represent conflicting interests; that Mitchell's representation of Williams did not have an adverse effect on Mitchell's representation of Chambers; and that Mitchell did not have a conflict of interest while representing Chambers. We observe that the Supreme Court has not held that the standard applied by the state court applies to claims of successive

6

representation conflicts.  See Mickens v. Taylor, 535 U.S. 162, 176 (2001) (declining to decide whether to extend standard for multiple concurrent representation  conflicts in Cuyler v. Sullivan, 446 U.S. 335 (1980) -- conflict actually affected adequacy of representation -- to successive representation conflicts); but see Perillo v. Johnson, 205 F.3d 775, 797-98 (5th Cir. 2000) (holding that Cuyler standard applies to all multiple representation conflicts, whether concurrent or successive, under pre-AEDPA law, and holding Teague bar inapplicable).  Even assuming that the state court incorrectly applied the Cuyler standard rather than the prejudice standard of Strickland v. Washington, 466 U.S. 668 (1984), its decision is not objectively unreasonable.  The Cuyler standard is less demanding of habeas petitioners than the Strickland standard, see Perillo, 205 F.3d at 781, and Chambers has not demonstrated that his Sixth Amendment rights were violated under either standard.  Chambers has not offered any convincing explanation of how anything Mitchell did or did not do in Chambers's 1992 appellate proceedings could have jeopardized Williams's 1975 guilty plea or the sentence he is now serving, or the conditions of his imprisonment.  Thus, there is no basis for the speculation that Chambers's Sixth Amendment right to the effective assistance of counsel was harmed because Mitchell was unwilling to raise any issues critical of Williams in Chambers's appeal.

B

7

The state court did not unreasonably conclude that Chambers's appellate counsel did not render ineffective assistance by failing to appeal the denial of Batson challenges to the prosecution's peremptory strikes of three minority prospective jurors. The trial court judge conducted a hearing on the objections and found that the prosecutor provided race-neutral explanations for the challenged strikes, and that there was no evidence that the prosecutor's explanations were pretextual. In rejecting Chambers's state habeas claim, the trial court stated that it had expected the prosecution to strike these jurors "due solely to their answers and not due to their race." The trial court also noted that two African-Americans and one Hispanic served on Chambers's jury, and that the prosecution had accepted three minority veniremembers that the defense struck. Chambers concedes that he cannot prove that the State exercised a high percentage of strikes against minorities, that the strikes resulted in an all-white jury, or that whites and minorities were questioned differently. The state court's decision that Chambers's appellate counsel did not render ineffective assistance by failing to raise a meritless Batson claim on direct appeal is not contrary to, or an unreasonable application of, clearly established federal law.

C

The state court's decision that Chambers's appellate counsel did not render ineffective assistance by failing to appeal the

8

prosecutor's comment on his failure to produce photographs is not objectively unreasonable.

During closing arguments at the guilt-innocence phase, defense counsel argued:

> You know, we don't have anybody--we have got all these investigators and all this manpower and everything, but the only picture that [Deia Sutton has] ever been shown, according to her own testimony, in 17 years, is Mr. Chambers' picture, and it's in a photo lineup that nobody can bring down here and show you. It doesn't exist anymore, which is pretty convenient, I guess. Just doesn't exist anymore.
>
> Why get rid of it? We don't know what Mr. Chambers looked like back in April of '75. Nobody sees fit to come down and show you that. Nobody's seen fit to come down here and show you what he looked like. Nobody's -- and they didn't see fit to say, "Hey, could it have been this guy? Could Bickems have been the guy that did it?" No, they didn't show you that.
>
> Did they talk--did they even show her a picture of Williams? No, they didn't do that. We all know that.

In response, the prosecutor asked the jury to consider that Chambers could have produced a photograph of himself to show that he does not resemble the victims' attacker:

> We know from the testimony of Deia, she sees a photo lineup. It's not in existence anymore. I would like to bring it to you, I can't. It's long gone. We know she saw a photo lineup, seven photographs of black males, all about the same age, same body configurations, same hair type, and she immediately, without any hesitation, goes to the photograph of Mr. Chambers. They say, why don't we have a photograph of Mr. Chambers? I don't have that

9

photo lineup. It's gone. We know he's got a
father and family members. They could produce
a photo.

Defense counsel objected, and the trial court sustained the objection. The prosecutor then continued, without objection:

Photographs of the Defendant exist. They
could bring them forth. Both sides have equal
subpoena power and both sides have a right to
bring photographs that they deem is [sic]
appropriate and admissible relevant [sic].

The Texas Court of Criminal Appeals adopted the state habeas court's findings that (1) "essentially the same argument was repeated later in the trial without objection," so any claim of error was procedurally barred; (2) the argument was a proper response to defense counsel's argument that "We don't know what Mr. Chambers looked like back in April [of] '75"; (3) the argument was not an indirect comment on Chambers's failure to testify; and (4) therefore, appellate counsel did not render ineffective assistance by "reasonably deciding not to assert the seemingly frivolous point of error." Chambers has not demonstrated that the state court's decision is objectively unreasonable and, therefore, he is not entitled to federal habeas relief on this claim.

D

The state court did not unreasonably conclude that Chambers's appellate counsel did not render ineffective assistance by failing to appeal the admission of testimony from a news reporter regarding statements made by Chambers while on death row. At the punishment phase of the third trial, a former reporter for D Magazine, Mark

10

Donald (a licensed Texas attorney), was called as a rebuttal witness for the State. Over Chambers' objection, Donald testified that, while writing a story about the crime, and with the permission of Chambers's counsel at the second trial, he interviewed Chambers in the Dallas County Jail in January 1986, two months after Chambers's second trial. Donald testified that Chambers told him that by the age of sixteen, Chambers could get girls, guns and drugs, including marijuana, reds, codeine, coke, and smack if he wanted, but that the only drug he used was marijuana because he did not like to lose control. Chambers argues that his appellate counsel should have appealed the admission of Donald's testimony, because it undercut a major defense contention -- that Chambers's normally peaceful nature was altered by drug use.

The state habeas court held, inter alia, that because similar evidence was introduced without objection, error had been waived, and appellate counsel was not in a position to appeal the admission of Donald's testimony. Chambers has not demonstrated that the state court's decision is contrary to, or an unreasonable application of, clearly established federal law.

E

The state court did not unreasonably conclude that Chambers's Eighth Amendment rights were not violated by the trial court's refusal to admit evidence of the criminal history of Williams, the accomplice, to demonstrate Chambers's comparative culpability, nor

11

did it unreasonably conclude that appellate counsel did not render ineffective assistance by failing to raise this issue on direct appeal.

At the punishment phase, Chambers sought to introduce as mitigating evidence certified copies of accomplice Clarence Ray Williams's three prior violent criminal convictions. Chambers argued that the record of convictions would show that Williams was a far more dangerous man than Chambers; that Williams was likely the leader; that Williams had led Chambers astray; and thus it was fundamentally unfair for Chambers to be executed while Williams "relaxed in prison" on a life sentence. After the trial court ruled that it would admit only Williams's indictment, judgment and sentence for the murder and robbery for which Chambers was being tried, defense counsel withdrew the offer of all of Williams's convictions, including Williams's stacked life sentences for the murder of McMahan and the robbery of Deia Sutton. Counsel explained that the admission of Williams's conviction and sentences for the crime for which Chambers was being tried, without Williams's criminal history, would fail to convey to the jury the magnitude of Williams's dangerousness and would have presented a misleading picture of Williams's and Chambers's relative culpability.

The Texas Court of Criminal Appeals adopted the findings of the state habeas court that: the claim was procedurally barred because defense counsel withdrew their offer to introduce the

12

evidence after the trial court ruled that it would admit only Williams's conviction and sentence for the crime for which Chambers was being tried; alternatively, evidence of Williams's criminal history was irrelevant to the determination of Chambers's individual culpability; and Chambers was not harmed by the exclusion of the challenged evidence because his trial counsel were still able to achieve the desired effect by having various witnesses testify to Williams's bad character.

At the time of Chambers's trial in 1992, clearly established federal law, as determined by the Supreme Court, required that the jury be able to consider, as a mitigating factor, any aspect of Chambers's character or record and the circumstances of the offense that he proffered as a basis for a sentence less than death. See Woodson v. North Carolina, 428 U.S. 280, 304 (1976) (plurality) ("in capital cases the fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death"); Lockett v. Ohio, 438 U.S. 586, 604 (1978) (plurality) ("the sentencer [may] not be prevented from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence other than death"); Eddings v. Oklahoma, 455 U.S. 104, 112 (1982) ("the rule in Lockett recognizes that justice ... requires ... that

13

there be taken into account the circumstances of the offense together with the character and propensities of the offender") (internal quotation omitted); Penry v. Lynaugh, 492 U.S. 302, 328 (1989) ("In order to ensure reliability in the determination that death is the appropriate punishment in a specific case, the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime.") (internal quotation omitted).

The Supreme Court has never held that a capital murder defendant has an Eighth Amendment right to present an accomplice's criminal history. Williams's criminal history is not an aspect of Chambers's character or record, and is not a circumstance of the capital murder for which Chambers was on trial. Thus, the state court's conclusion that evidence of Williams's criminal history was not relevant to the determination of Chambers's individual culpability is not contrary to, or an unreasonable application of, clearly established federal law. To be sure, however, the trial court ruled that Chambers could present as mitigating evidence the fact that Williams received two life sentences for the murder of McMahan and robbery of Sutton, but his counsel chose not to do so. The state court's decision that appellate counsel did not render ineffective assistance by failing to appeal a procedurally barred claim likewise is not contrary to, or an unreasonable application of, clearly established law.

F

14

Finally, the state court's decision that the Texas special punishment issues were not unconstitutional as applied to Chambers is not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Chambers offered the following mitigating evidence at the punishment phase of the trial. Cathy Hill testified that Chambers was the father of one of her three children, who was about a year old at the time of the murder; that he cared for and supported them and sent them cards from prison; and that his parents are nice, hard-working, God-fearing people who tried to raise Chambers the right way. Rhonda Mayes, Chambers's daughter, who was 18 years old at the time of trial, testified that Chambers had sent her cards and letters from prison, and that she had visited him in prison. Ron Byrd, Chambers's cousin, testified that he grew up with Chambers in the projects; that Chambers's parents are good Christian people who treated Chambers with love; that Chambers went to church; that he was not in trouble while they were growing up together; and that Chambers was remorseful. Chambers's sister, Patty, testified that he was respectful to his family, was well-liked, and had a good sense of humor and a good personality. Chambers's uncle, James, testified that Chambers was a normal kid, that his parents were good, church-going people, and that Chambers was polite and kind. Chambers's mother testified that he had a normal upbringing, that she took him to church, and that he seemed to be sorry for what he had done. Chambers's first cousin, Doris

15

Mead, testified that she babysat him while his parents worked; that he was not a bully; and that he was respectful to his elders. Reverend Raymond Hunter, Chambers's pastor, testified that Chambers had always been respectful. Howard Falls testified that he grew up in the projects with Chambers; that Chambers used marijuana and alcohol; but that he did not bully or hurt people. Wayne Sternes, who grew up with Chambers, testified that everybody loved Chambers; that he did not have a violent nature; and that he had no business "running with" Williams, who was a gangster. Julius Sternes, who also grew up with Chambers, testified that he was a normal, peaceful guy who was not a troublemaker. Chambers's father testified that Chambers was respectful, well-liked, had a good sense of humor, and worked, painting houses. Glenn Byrd, Chambers's cousin, testified that Chambers was respectful and pleasant, well-liked, and not a bully. Dr. George Parker, a clinical psychologist, testified that psychological tests showed that Chambers falls into the class of prisoners who are least likely to have trouble or to be a major discipline problem; that Chambers does not have an antisocial personality disorder; and that he is remorseful. Dr. Richard Coons, a psychiatrist, testified that Chambers is not a sociopath; that there is not a probability that he would commit criminal acts of violence in the future; that he feels remorse and sadness about the crime; and that the incident was an aberration in his behavior.

16

In his closing argument, defense counsel argued that the evidence of Chambers's remorse for the crime, his caring relationship with his daughter, his assistance to others, his limited criminal history and absence of violent criminal history, his upbringing in a depressed, crime-infested neighborhood, his relative youth at the time of the crime, his good behavior while incarcerated, and his age, 37 at the time of his 1992 trial, supported a "no" answer to the special issue on future dangerousness.

The trial court instructed the jury:

> When you deliberate about the questions posed in the Special Issues, you are to consider any mitigating circumstances supported by the evidence presented in both phases of the trial. A mitigating circumstance may be any aspect of the defendant's character and record or circumstances of the crime which you believe makes a sentence of death inappropriate in this case. If you find there are any mitigating circumstances, you must decide how much weight they deserve and give them effect when you answer the Special Issues. If you determine, in consideration of this evidence, that a life sentence, rather than a death sentence, is an appropriate response to the personal moral culpability of the defendant, you are instructed to answer at least one of the Special Issues under consideration "No".

On direct appeal, Chambers argued that the Texas special issues were unconstitutional as applied to him because they did not allow the jury to consider and give effect to his mitigating evidence of his youth at the time of the commission of the offense and his good behavior in prison for the seventeen years between his

17

first conviction and his third trial.  The Texas Court of Criminal Appeals rejected that contention, holding that this evidence was not beyond the scope of the special issues and therefore did not call for a mitigating evidence instruction.  903 S.W.2d at 34-35.

The state habeas court denied Chambers's Penry claims on the ground that the above-quoted "nullification" instruction allowed the jury to consider and give effect to his mitigating evidence in assessing the death penalty.  However, in Penry v. Johnson, 532 U.S. 782 (2001) (Penry II), the Supreme Court held that a similar "nullification" instruction was "an inadequate vehicle for the jury to make a reasoned moral response to Penry's mitigating evidence." Id. at 790.  The Court stated that because Penry's mitigating evidence (mental retardation and severe child abuse) was beyond the scope of the special punishment issues on future dangerousness and deliberateness, it was logically and ethically impossible for the jury to answer the special issues truthfully and at the same time give effect to Penry's mitigating evidence.  Id. at 799-800.

The district court held that Chambers's mitigating evidence was not constitutionally relevant under this court's former relevance standard (criminal act was attributable to uniquely severe permanent handicap with which defendant was burdened through no fault of his own) and, therefore, there was no Penry error and Chambers was not harmed by the nullification instruction.

At this court's direction, the parties filed supplemental briefs addressing the impact of Smith v. Texas, 543 U.S. 37 (2004),

18

and Tennard v. Dretke, 542 U.S. 274 (2004).  In Tennard,  in which the petitioner presented mitigating evidence of low IQ and gullibility, the Supreme Court rejected the relevance standard applied by this court and by the district court in Chambers's case. 542 U.S. at 283-88.  In Smith, the Texas Court of Criminal Appeals had also applied the discredited relevance standard, and the Supreme Court reversed, citing Tennard.  543 U.S. at 43-45.  The Court held further that the nullification instruction given at Smith's trial was not adequate to permit the jury to give effect to Smith's mitigating evidence (low IQ, speech handicap, organic learning disability, placement in special education classes, youth and immaturity, and troubled background, including drug-addicted father who stole from the family).  Id. at 45-48.

Chambers concedes that the special issues adequately addressed his evidence of good behavior in prison and his youth at the time of the offense, but he argues that much of his other mitigating evidence -- particularly his caring relationship with his daughter, his efforts to help others, and the deprivations of his community -- had little, if anything, to do with the deliberateness and future dangerousness inquiries.  He contends further that the nullification instruction given to the jury injected an intolerable arbitrariness into the sentencing proceeding because it permitted jurors to give effect to mitigating evidence only by violating their oaths to answer the special issues truthfully.

19

Chambers argues that, although a defendant's adaptability to structured environments, or his non-violent nature generally, may bear on future dangerousness, other kinds of good character evidence -- such as his concern for his daughter and his helpfulness to others -- is unrelated to the likelihood of future dangerousness. He relies for support on Justice O'Connor's concurring opinion in Franklin v. Lynaugh, 487 U.S. 164, 186 (1988), in which she contrasted evidence of good behavior in prison with evidence of "voluntary service, kindness to others, [and] religious devotion," which might call for a sentence less than death, but not be reflected in the jury's answer to the future dangerousness issue.

Although it has had many opportunities to do so, the Supreme Court has never held that evidence of good character traits and upbringing in a disadvantaged community cannot be considered and given effect under the Texas special issues. In Graham v. Collins, 506 U.S. 461 (1993), the Supreme Court held that the rule sought by Graham -- that the Texas special issues did not allow the jury to give effect to mitigating evidence of Graham's youth, family background (childhood poverty, parents' separation, transient upbringing, mother's nervous condition), and positive character traits (regular church attendance, visiting his mother, helping with family chores, buying food and clothing for his two young children) -- was not dictated by precedent in effect at the time Graham's conviction and sentence became final in September 1984,

20

and thus constituted a new rule barred by Teague v. Lane, 489 U.S. 288 (1989). Graham, 506 U.S. at 463-64, 475-76. The Court stated:

> ... Jurek [v. Texas, 428 U.S. 262 (1976)] is reasonably read as holding that the circumstance of youth is given constitutionally adequate consideration in deciding the special issues. We see no reason to regard the circumstances of Graham's family background and positive character traits in a different light. Graham's evidence of transient upbringing and otherwise nonviolent character more closely resembles Jurek's evidence of age, employment history, and familial ties than it does Penry's evidence of mental retardation and harsh abuse.

Id. at 476. The Court stated that, not only was the rule sought by Graham not dictated by precedent existing at the time his conviction became final in 1984, it could not say, "even with the benefit of the Court's subsequent decision in Penry, that reasonable jurists would be of one mind in ruling on Graham's claim today." Id. at 477. Graham was decided on January 25, 1993. Chambers's conviction and sentence were affirmed on direct appeal on June 28, 1995. Because he did not seek further review in the Supreme Court, his conviction became final when the time for filing a petition for a writ of certiorari expired. Between the time that Graham was decided and the time that Chambers's conviction became final, the Supreme Court did not hold that evidence of positive character traits and transient upbringing could not be adequately considered and given effect by the jury under the Texas special issues. Therefore, Teague bars the relief sought by Chambers.

21

Consistent with Graham, this court has also held, repeatedly, that the kinds of mitigating evidence that Chambers presented can be considered and given effect by the jury in answering the special issues.  See Barnard v. Collins, 958 F.2d 634, 640-41 (5th Cir. 1992) (good character, including evidence of carpentry skills, work history, and familial responsibility and support), cert. denied, 506 U.S. 1057 (1993); James v. Collins, 987 F.2d 1116, 1121-22 (5th Cir.) (cooperation with police, remorse, impoverished and abusive family history, positive familial ties despite troubled upbringing), cert. denied, 509 U.S. 947 (1993); Andrews v. Collins, 21 F.3d 612, 629-30 (5th Cir. 1994) (good family relationships), cert. denied, 513 U.S. 1114 (1995); Jacobs v. Scott, 31 F.3d 1319, 1327-28 (5th Cir. 1994) ("troubled childhood; cooperation with the police; remorse; efforts to better his life by starting a successful auto repair business while on parole and educating himself while in prison; trustworthiness; love for his family and friends; and, that he was president of a prison group dedicated to benefiting charitable institutions and helping unwed mothers and abused children"), cert. denied, 513 U.S. 1067 (1995); Boyd v. Johnson, 167 F.3d 907,  912 (5th Cir.) (positive character traits), cert. denied, 527 U.S. 1055 (1999); Beazley v. Johnson, 242 F.3d 248, 260 (5th Cir.) (good character), cert. denied, 534 U.S. 945 (2001); Newton v. Dretke, 371 F.3d 250, 256-57 (5th Cir.) (youth, good character, church attendance, cooperation with police, unfaithful/drug dealing spouse, and impoverished background), cert.

denied, 543 U.S. 964 (2004); Summers v. Dretke, 431 F.3d 861, 882-83 (5th Cir. 2005) (nonviolent nature and general good character, grief for parents' death, ability to conform to prison life); Coble v. Dretke, 444 F.3d 345, 362-63 (5th Cir. 2006) (good character, feelings of remorse and guilt, poverty in childhood, stepfather's alcoholism and conflicts with mother, and mother's nervous breakdown). Contrary to Chambers's contention, Smith did not overrule all of these cases. See Tennard v. Dretke, 442 F.3d 240, 250 (5th Cir. 2006) ("Typically, evidence of good character, or of transitory conditions such as youth or being under some particular emotional burden at the time, will tend to indicate that the crime in question is not truly representative of what the defendant's normal behavior is or may become over time, and that the defendant may be rehabilitable so as not to be a continuing threat to society. The core of Jurek -- which we cannot conclude has been abandoned -- is that the mitigating force of this kind of evidence is adequately accounted for by the second special issue."); Bigby v. Dretke, 402 F.3d 551, 570 (5th Cir. 2005) ("The Supreme Court's rulings in Penry II and Smith should not be read to disturb its earlier holdings affirming the constitutionality of Texas's statutory death penalty sentencing scheme."), cert. denied, 126 S.Ct. 239 (2005); In re Kunkle, 398 F.3d 683, 685 (5th Cir. 2005) ("We are not persuaded that the Court intended to undercut Jurek, Graham, and Johnson without even citing them. Whether Tennard or

23

<u>Smith</u> sweep so broadly as to create a conflict with its own <u>Jurek</u> or <u>Graham</u> decisions is for the Supreme Court.").

A juror who was considering whether a defendant should live or die based on whether he would be a future danger to others, could reasonably consider and give mitigating effect to evidence that he has maintained a caring relationship with his daughter, despite his incarceration, and evidence that he has been helpful to others in the past, despite having been brought up in an economically-disadvantaged, crime-ridden neighborhood, and thus conclude that he is less likely to commit criminal acts of violence in the future if sentenced to life in prison. See <u>Boyd v. Johnson</u>, 167 F.3d 907, 912 (5th Cir.) ("Evidence of good character tends to show that the crime was an aberration, which may support a negative answer to the special issue regarding the future dangerousness of the defendant."); <u>James</u>, 987 F.2d at 1122 ("[s]uch positive character evidence is directly related to whether or not James would continue to present a threat to society, and an additional instruction to that effect is not required"). Because this evidence was not beyond the effective reach of the jury in answering the special issues, the nullification instruction given in this case did not create any ethical or moral dilemma for the jury, because it was not put in the position of having to answer the special issues falsely in order to give effect to Chambers's mitigating evidence. See <u>Bigby</u>, 402 F.3d at 570 (noting that this court has found a nullification instruction "to be unconstitutional only where the

24

special issue questions themselves are not broad enough to provide a vehicle for the jury to give effect to the defendant's mitigation evidence").

In sum, we conclude that there is not a reasonable likelihood that the jury would have found itself foreclosed from considering and giving effect to Chambers's mitigating evidence when answering the special issues. See Johnson v. Texas, 509 U.S. 350, 368 (1993); Boyde v. California, 494 U.S. 370, 380 (1990). That evidence was not beyond the effective reach of the jury because it was within the scope of the special issues, and could have been considered and given constitutional effect by the jury in answering those special issues. Therefore, the state court did not unreasonably conclude that under clearly established law, the special issues, as applied to Chambers, were not unconstitutional.

III

For the foregoing reasons, the judgment of the district court denying Chambers's petition for a writ of habeas corpus is

AFFIRMED.